DANIEL MULHEARN, PETITIONER-RESPONDENT, v. FEDERAL SHIPBUILDING AND DRY DOCK COMPANY, RESPONDENT-PETITIONER.

Argued May 23, 1949—Decided June 13, 1949.

*Mr. William L. Dill, Jr.,* argued the cause for the petitioner (*Messrs. Stryker, Tams & Horner,* attorneys; *Messrs. William L. Dill, Jr.,* and *John J. Monigan, Jr.,* of counsel).

*Mr. Patrick F. McDevitt* argued the cause for the respondent (*Mr. Louis Reich,* attorney; *Messrs. Edward A. Markley* and *Patrick F. McDevitt,* of counsel).

The opinion of the court was delivered by

VANDERBILT, C. J. The respondent, Federal Shipbuilding and Dry Dock Company, petitioned for certification to the Division of Workmen's Compensation of the Department of Labor and Industry to review a judgment granting compensation to Daniel Mulhearn, the petitioner below. The petition for certification disclosed that Mulhearn, an employee of the respondent, was injured in an accident arising out of and during the course of his employment while working aboard the United States Army transport General Rose. He filed a petition for compensation with the former Workmen's Compensation Bureau and compensation was allowed by its successor, the Division of Workmen's Compensation of the Department of Labor and Industry. It appears that between January, 1947, and January, 1949, the General Rose, as well as a similar ship, the General Hatch, was sent to the shipyards of the respondent for conversion and change of accommodations from wartime naval transport to peacetime army transport. The conversion work was done upon both vessels while they were moored in the Hackensack River alongside a dock at the respondent's shipyards. During the performance of the work numerous employees of the respondent were injured as a result of which approximately 175 petitions for compensation have been filed with the former Workmen's Compensation Bureau and numerous others have been filed with the Federal Security Agency under the Longshoremen's and Harbor Workers' Act (33 *U. S. C.,* § 901).

The respondent raised the defense below that the injuries received by the petitioner, Mulhearn, were compensable only under the Longshoremen's and Harbor Workers' Act and that the Workmen's Compensation Division lacked jurisdiction to award compensation under the New Jersey Workmen's Compensation Act. This defense was overruled by the Division of Workmen's Compensation and the respondent below sought

certification primarily to determine this jurisdictional question, which it asserts is a substantial question arising under· the Constitution and statutes of both the United States and this State, the determination of which will affect a large number of other cases now pending.

This court, doubting its jurisdiction to certify a cause from the Division of Workmen's Compensation, requested briefs and oral argument. Article VI, section V, paragraph 1, of the Constitution of 1947 reads:

"1. Appeals may be taken to the Supreme Court: * * *
"(d) On certification by the Supreme Court to the Superior Court and, where provided by rules of the Supreme Court, to the County Courts and the inferior courts * * *."

Our Rules provide for certification only to the Appellate Division of the Superior Court, *Rule* 1:5–2, and "to the trial courts," *Rule* 1:5–3.

The question is thus squarely raised whether or not the Division of Workmen's Compensation is an inferior court within the meaning of the Constitution so that we may review its judgments directly by certification.

To determine the position of the Division of Workmen's Compensation in the state government it is necessary to trace its history and to examine its functions. The Department of Labor was created by *P. L.* 1904, *c.* 64, *p.* 152, which authorized the Governor to appoint a commissioner of labor subject to confirmation by the Senate. In 1911 the Workmen's Compensation Act was passed, *P. L.* 1911, *c.* 95, *p.* 134, and at first claims for compensation were adjudicated by the judges of the Court of Common Pleas, *idem.,* § 18. In 1916 the Department of Labor was reorganized with departmental bureaus, *P. L.* 1916, *c.* 40, *p.* 67, and, by another act of the same year, *P. L.* 1916, *c.* 54, *p.* 97, a Workmen's Compensation Aid Bureau was established within the department. Under it the commissioner of labor was charged with the duty of observing the operation of the Workmen's Compensation Act. In 1918 the act last mentioned was repealed by *P. L.* 1918, *c.* 145, *p.* 429, which at the same time created in the Depart-

ment of Labor the Workmen's Compensation Bureau. In 1948, as part of the program of reorganizing the executive and administrative instrumentalities of the State under the Constitution of 1947, a Department of Labor and Industry was created in the executive branch of the state government, *P. L.* 1948, *c.* 446, *p.* 1762, *R. S.* 34:1A–1 *et seq.,* with the commissioner of labor and industry as the administrator and head of the department. The Division of Workmen's Compensation was one of the three divisions set up in the Department of Labor and Industry, *idem,* § 5. Thus, it will be observed that since 1918 workmen's compensation has been administered in a department of the executive branch of the government, and this policy has been incorporated in section 1 of the act last referred to establishing "in the Executive. Branch of the State Government a principal department which shall be known as the Department of Labor and Industry," *R. S.* 34:1A–1.

Notwithstanding all this, it is argued that the Division of Workmen's Compensation, like the Workmen's Compensation Bureau before it, is a court. It is urged that the commissioner of labor and industry, the director of workmen's compensation and the deputy directors and the referees, all of whom sitting individually or together have exclusive, original jurisdiction of all claims for workmen's compensation under the act, *R. S.* 34:15–49, are in fact as much judges as the judges of any of the trial courts in the State. Their hearing rooms have every appearance of court rooms; the deputy commissioners wear judicial robes; their proceedings are conducted with judicial decorum; the evidence is taken stenographically; by their rules appearances are limited to members of the bar; while they are not bound by the rules of evidence, *R. S.* 34:15–56, they are bound to limit the evidence taken before them to competent testimony, *Helminsky v. Ford Motor Co.,* 111 *N. J. L.* 369 (*E. & A.* 1933); after the testimony has been taken the hearing officer weighs the evidence and finds the facts, exercising his judgment as any judge does in determining the facts; he reduces his findings to writing, and files his judgment with the secretary of the Division of

Workmen's Compensation, and on its being filed in the office of the proper county clerk it may be "collected" in the same manner as judgments of the former Court of Common Pleas, *R. S.* 34:15–58.

But granting that all these characteristics of the work of the Division of Workmen's Compensation are typical of judicial proceedings, the Division still lacks the essential attributes of a court under the new Constitution. First of all, the Constitution requires that the Governor shall nominate and appoint and the Senate confirm not only all of the judges of the courts expressly named in the Constitution but also "the judges of inferior courts with jurisdiction extending to more than one municipality," article VI, section VI, paragraph 1. Geographically the jurisdiction of the Division of Workmen's Compensation extends throughout the State, and if it were a court its judges would have to be appointed by the Governor, subject to confirmation by the Senate. The Constitution further provides that "no commission to any such office [a judge] shall be sent to the Senate for confirmation until after a seven days' public notice by the Governor," *idem.* There is, moreover, a clearly marked public policy evidenced by both the Constitution and the statutes that all our judges shall be members of the bar. The commissioner of labor and industry, however, need not be a member of the bar, *R. S.* 34:1A–2, and the same is true of the director of workmen's compensation, *R. S.* 34:1A–11. The term of each of these officers is for the term of the Governor appointing him and until his successor is appointed and has qualified, *idem.* The commissioner of labor and industry may assign the director of workmen's compensation duties in the Division of Labor or the Division of Employment Security, *R. S.* 34:1A–12(e).

Not only are the hearing officers of the Workmen's Compensation Division appointed in a different manner than judges and with different qualifications, and for different terms, but the commissioner of labor and industry is expressly given the power as head of his department to exercise a wide variety of administrative and supervisory functions. The

exercise of these functions as to the hearing officers of the Division of Workmen's Compensation, were they judges, would infringe on the judicial freedom from interference from outside the judicial establishment which is a fundamental attribute of a judge. Thus, the commissioner is given the power to administer the work of the department, appointing and removing officers and other personnel subject to *R. S. Title* 11, *Civil Service,* and other applicable statutes, "perform, exercise and discharge the functions, powers and duties of the department throughout such divisions as may be established by this act or otherwise by law," etc., *R. S.* 34:1A–3(c)—provisions which not only are inconsistent with essential judicial independence, but which, if the Division of Workmen's Compensation were a court, would fly in the face of express provisions of article VI, section VII, paragraph 1, of the Constitution making the Chief Justice of the Supreme Court "the administrative head of all of the courts in the State."

The rule-making and regulation-making powers are twice vested in the commissioner, first by *R. S.* 34:15–64 in conjunction with the deputy directors and, secondly, acting alone, by *R. S.* 34:1A–3(e)(f). If the Division of Workmen's Compensation were a court, it would be subject to the rule-making power of the Supreme Court under article VI, section II, paragraph 3, of the Constitution, which expressly extends to "all of the courts in the State." In the process of making rules of court which extended over a full year, and in which this court had the assistance of many hundreds of judges and lawyers throughout the State, it was never suggested that the court had any responsibility or power to draft rules of administration, practice and procedure for the trial of claims in the Workmen's Compensation Bureau.

We have had cited to us decisions in which our appellate courts have conceded to the Workmen's Compensation Bureau powers customarily exercised by courts, as *e. g.,* the right to comment on the evidence particularly with respect to physical demonstrations, which otherwise would not be shown on the record, *Licker v. J. G. Martin Box Co.,* 127 *N. J. L.* 136

(*Sup. Ct.* 1941) ; pleading a proper judgment of the Workmen's Compensation Bureau as *res judicata* in a court of law, *Mangani v. Hydro, Inc.,* 119 *N. J. L.* 71 (*E. & A.* 1937), and likewise decisions such as *Henry A. Dreer, Inc., v. Unemployment Compensation Commission,* 127 *N. J. L.* 149, 151 (*Sup. Ct.* 1941), where the opinion uses the word "courts" but the context clearly shows that tribunals or some similar term was intended. The fundamental fallacy underlying the attempt to reason from the analogy of these and similar cases that the Division of Workmen's Compensation is a court is that they ignore article III of the Constitution distributing the powers of government:

"The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."

We are told that the doctrine of the separation of powers among the legislative, executive and judicial branches of the state government is "founded upon a political philosophy and not upon a technical rule of law." This argument ignores the fact that in the face of widespread delegation of legislative powers in this State and elsewhere article III of our present Constitution was copied almost word for word from article III of the Constitution of 1844, "departments" being changed to "branches" because it was desired to use the word "departments" for designating parts of the executive branch.

It is a matter of history that the former article III found its way into the Constitution of 1844 to remedy the fundamental defects of the Constitution of 1776, which was hastily framed and adopted within nine days under revolutionary pressure. There was no provision in this Constitution distributing powers among the three branches of government. On the contrary, the doctrine of the separation of powers was ignored, the Governor serving as President of the Council, the upper house of the Legislature, and as Chancellor and Ordinary or Surrogate General, article VIII; the Governor

and the Council constituted the Court of Appeals in the Last Resort, article VIII; and the Legislature in joint session elected the Governor annually, article VII, and the justices of the Supreme Court for the term of seven years, and the judges of the Court of Common Pleas for five years, article XII; see *Erdman, The New Jersey Constitution of 1776, passim,* especially *pp.* 63-67, 123-126. The *Federalist, Paper No. XLVII.* The doctrine of the separation of powers is not peculiar to our Constitutions. It exists in one form or another in almost every American constitution. The constitution of six states prescribe a simple distribution of the powers of government into three departments, legislative, executive, and judicial; in six other states there is added a prohibition of any admixture of powers; the constitutions of twenty-six states provide for a threefold distribution of powers with designated exceptions; eight states, along with the United States, have no explicit separation of powers, but it is implied from the division of all governmental powers into three separate articles; two states provide for an administrative branch in prescribing the separation of power, *Frankfurter and Davison, Cases and Other Material on Administrative Law* (2d ed. 1935). *Appendix* 1; *pp.* 637-639; *Bondy, The Separation of Governmental Powers* (1896), *c.* III. The doctrine of the separation of powers epitomizes not only the struggle of Englishmen against royal tyranny, running over centuries and leading ultimately to a recognition by the king of the supremacy of Parliament in the matters of legislation and taxation, and of the independence of the judiciary as against both king and Parliament, *Holdsworth,* 10 *History of English Law* 713-724, but also the conflict of the American colonists with royal governors and the English Board of Trade. The doctrine evolved from these struggles as rationalized even to the extent of misinterpretation by Montesquieu (see *The Spirit of Laws, c. VI, The Constitution of England* (1748)), has not only been accepted as a cardinal principle of American constitutional law but has been relied upon from our earliest days as a nation as a fundamental and indispensable bulwark against despotism. The *Federalist, Paper Nos. XLVII-LI.*

Lord Acton's aphorism merits quotation at this point: "Power tends to corrupt and absolute power corrupts absolutely." *Acton: Essays on Freedom and Power* (1948). The doctrine of the separation of powers is the great contribution of Anglo-American lawyers to the prevention of absolutism and the preservation of the rights of the individual against the state.

The proper delegation of legislative power to administrative agencies within the executive department is not an infringement of article III. The Legislature cannot delegate all its power, *Schechter Poultry Corp. v. United States,* 295 *U. S.* 495, 529-530, 55 *S. Ct.* 837, 79 *L. Ed.* 1570, 1580, 97 *A. L. R.* 947 (1935), and in delegating segments of its power it must set up adequate rational standards to guide the administrative body to whom it is entrusting the exercise of such delegated power, *State v. Traffic Telephone Workers,* 2 *N. J.* 335 (1949), in considering any delegation of legislative power. And it must be remembered that what the Legislature delegates it may at any time withdraw. Neither is the grant to administrative agencies of the power to adjudicate controversies within the various fields of administrative activity a violation of article III, for every administrative adjudication is subject to the doctrine of the supremacy of law or, as it has often been called, the Rule of Law. If an administrative adjudication is repugnant to the state or the federal Constitution or the law of the land as, *e. g.,* a treaty, or is *ultra vires* a statute, it is subject to attack by judicial review. Nowhere is the right of judicial review of administrative determinations more strictly enforced than in this State, where by article VI, section V, paragraph 4, of the Constitution, prerogative writs with the uncertainty resulting from their discretionary character have been superseded by "proceedings for review, hearing, and relief as of right in civil cases."

The failure to comprehend that administrative adjudication is not judicial springs from the erroneous notion that all adjudication is judicial. This is not so and never has been so. When the Legislature passes on the qualification of its own members or disciplines one of its members or decides a

case of legislative contempt, it is adjudicating but it is not performing a judicial function; it is not acting as a court in the constitutional sense. When the Governor acts to decide a controversy under the Constitution or a statute as, *e. g.,* to remove a public officer after notice and hearing under article V, section IV, paragraph 5, of the Constitution, he is adjudicating, but he is not acting as a court or performing a judicial function in the constitutional sense. Were the rule otherwise and were every executive, administrative, legislative, or municipal adjudication deemed judicial and the official or body making the adjudication regarded as a judge or a court, we should be driven to treat every public official in the State, from the Governor to the members of a local board of adjustment passing on a zoning question, or of a board of education trying a school teacher on charges, as a judge or a court—a conclusion so extravagant that its mere statement demonstrates its fallaciousness as well as its undesirability. Once the obvious right of the Governor and the Legislature, each to adjudicate within his or its own proper sphere, is recognized and it is conceded that the courts are not the exclusive instrumentalities for adjudication, the true nature of the administrative adjudications, commonly termed *"quasi-*judicial," becomes apparent. This term serves to characterize not the quality of the adjudication but its origin outside the judicial branch of the government.

In the light of article III of the Constitution, the Division of Workmen's Compensation cannot be deemed a court. It is an administrative tribunal in a department that is a component part of the executive establishment. That does not render its functions any less significant in our social economy or its work any less important to the litigants who resort to it than if it were a court. Starting as an administrative body, designed to overcome some of the outmoded technical rules of law that formerly governed the relations of employer and employee and to administer relief summarily on the basis of a statutory schedule of compensation, the Division of Workmen's Compensation has, except for the fact that it lies outside the scope of the Judicial Article of the Constitution,

gradually acquired many of the attributes of a court. This has been the normal long-range evolution of a variety of administrative tribunals. Thus the Lord Chancellor was originally, as his name implies, the chief clerk of the king and dealt out administrative justice in the king's name in cases where the common law fell short. In the course of centuries the Lord Chancellor as an institution developed into a court as independent of the king as any other part of the judiciary. Again, the Board of Tax Appeals in the federal government was originally an appendage of the Treasury Department, but within a relatively few years it developed to the point where Congress found it desirable to transform it into the Tax Court of the United States, although it seems still difficult for the Treasury Department to adjust itself to the fact that the Tax Court is an independent entity. "There is the practice of long standing under which the Commissioner [of Internal Revenue] announces in the Internal Revenue Bulletins that he acquiesces in certain listed decisions of the Tax Court of the United States, formerly the Board of Tax Appeals, and that he does not acquiesce in certain other listed decisions." *The Federal Administrative Procedure Act and the Administrative Agencies* (1947), *p.* 159, *Dwan, "Administrative Review of Judicial Decisions: Treasury Practice,"* (1946) 46 *Col. L. Rev.* 581. But it is for the Legislature, not for the courts, to determine if and when the process of adjudication now carried on within the Division of Workmen's Compensation shall be transformed into a court.

The petition for certification will be denied for the reason that the Division of Workmen's Compensation is not a court and therefore this court is without jurisdiction to grant certification under the Constitution.

*For denial*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For granting*—Justice HEHER—1.