CHARLES WORTHINGTON, COUNTY EXECUTIVE AND MARIO FLORIANI, SHERIFF OF ATLANTIC COUNTY, PLAINTIFFS-APPELLANTS, v. WILLIAM H. FAUVER, COMMISSIONER, NEW JERSEY DEPARTMENT OF CORRECTIONS, AND BRENDAN BYRNE, GOVERNOR, STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued October 19, 1981—Decided January 6, 1982.

---

*Salvatore Perillo*, County Counsel, argued the cause for appellants (*Salvatore Perillo*, attorney; *Salvatore Perillo* and *Betty Ann Bittel*, Assistant County Counsel, on the brief).

*Michael R. Cole*, Assistant Attorney General, argued the cause for respondents (*James R. Zazzali*, Attorney General of New Jersey, attorney; *Joseph T. Maloney*, Deputy Attorney General, on the brief).

*Martin Verp*, County Counsel, submitted a brief on behalf of *amicus curiae* The Board of Chosen Freeholders of Passaic County (*Martin Verp*, attorney; *Michael H. Glovin*, Assistant County Counsel, on the brief).

*Lauren Anderson* and *Howard Moskowitz* submitted a brief on behalf of *amici curiae* Geraldo Morales and Lonnie Killingsworth.

The opinion of the Court was delivered by

PASHMAN, J.

To alleviate the potentially disastrous overcrowding of inmates in state and county correctional institutions, the Governor issued Executive Order No. 106 on June 19, 1981.[1] In promulgating the order, the Governor invoked his emergency powers under the Civil Defense and Disaster Control Act, *N.J.S.A.* App.A:9–30 *et seq.* This temporary emergency measure granted to the Commissioner of Corrections the authority to direct that county correctional facilities house prisoners sentenced to state institutions. The Commissioner was also given the power to redistribute such prisoners among the county facilities.

Atlantic County challenges the statutory and constitutional validity of this emergency measure. We hold that the Governor's Order is authorized by the Disaster Control Act and does not violate the constitutional principle of separation of powers.

I

It is commonly acknowledged that overcrowding in prisons causes grave problems. Rehabilitative programs and recreation

---

[1] The Order was to be effective for a 90 day period. It was extended on September 11, 1981 by Executive Order No. 108 until January 20, 1982.

become disrupted or nonexistent. As crowding increases, frustration and anger emerge, causing tempers to flare and fights to erupt. Lack of space makes it difficult if not impossible to segregate prisoners for disciplinary and other purposes. Overcrowding can contribute to riots.

According to the Commissioner of Corrections, prison overcrowding first became a serious problem in New Jersey in 1975. Although ameliorated somewhat from 1978 to 1980, the problem lately has reached crisis dimensions. This has been caused in large part by an increase in the number and length of custodial sentences following the effective date of the Code of Criminal Justice, adopted in 1979, *N.J.S.A.* 2C:1–1 *et seq.*[2]

At the time this suit was filed, the state prison population was well in excess of the system's capacity. This necessitated housing approximately 480 offenders sentenced to state prison in county facilities because the overcrowded state institutions were

---

[2]On September 1, 1979, the New Jersey Code of Criminal Justice became effective, resulting in a dramatic change in statewide sentencing practice. While the new Code includes a substantial overhaul of the criminal law, its greatest impact has been felt through several important changes in sentencing. One such change provides for new presumptive sentences of a certain number of years for persons imprisoned. *N.J.S.A.* 2C:44–1(f). These presumptive terms have resulted in an increase in ordinary (maximum) terms, and therefore a net increase in "real time served." Moreover, the "real time" which must be served has also increased due to parole ineligibility (mandatory minimum) terms which may be imposed; and recent amendments to the new Code have led to a presumption of incarceration in crimes of the first and second degree as well as the ability to impose a parole ineligibility term for *any* crime. These amendments will result in a further increase in the numbers of defendants imprisoned and the average length of sentence.

A third component of the new Code limits the amount of time to be served in a-county jail (for first, second and third degree crimes) to six months, so that when a judge wants to incarcerate a defendant for more than six months the judge must sentence him to state prison for a term at least at the bottom of the range for the degree of crime involved. This has greatly increased the number of prison commitments. [*Report of the Governor's Task Force on Prison Overcrowding*, December 3, 1981]

physically unable to receive them.[3] This in turn has created overcrowding in many county jails.

Certain counties are far more burdened by state prisoners than others. At the time this litigation began, Atlantic County Jail was at 121% of maximum rated capacity and housed 225 inmates, of whom 41 were state prisoners. At the same time, certain other county jails were only two-thirds full or less. Following the lead of several other counties, on June 16, 1981 the county executive and sheriff of Atlantic County filed a complaint in lieu of prerogative writs in Superior Court against the State Commissioner of Corrections. Plaintiffs sought to compel the Commissioner to accept custody of the state prisoners then housed in the county facility, alleging that his failure to do so violated *N.J.S.A.* 2C:43–10 and *N.J.S.A.* 30:4–6.[4]

After the lawsuit began, Governor Byrne issued Executive Order No. 106 on June 19, 1981. Declaring overcrowding in state prisons to be an emergency, the Order explained that the Department of Corrections "is physically unable to accept from the Sheriffs of the various counties the custody of inmates sentenced to the custody of the Commissioner of the Department of Corrections, as mandated by *N.J.S.A.* 2C:43–10(e)." The Governor invoked the emergency powers of the Disaster Control Act on the grounds that

these unusual conditions endanger the safety, welfare and resources of the residents of this State, and threaten loss to and destruction of property, and are

---

[3]That figure has now risen to over 600. Furthermore, but for the recent purchase and installation of trailers at various state facilities, the number of state prisoners in county facilities awaiting admission to state prison would now total more than 1,000 inmates.

[4]When this suit began, the Department of Corrections was already the defendant in several lawsuits. The courts in four separate counties (Essex, Hudson, Union, Morris) had issued orders directing the Commissioner to accept state prisoners from those counties' jails. Those orders are not directly before this Court.

too large in scope to be handled entirely by regular operating services of either the counties or the New Jersey Department of Corrections.

Because of the "need to efficiently allocate inmates of state and county penal and correctional institutions to those institutions having available space in order to alleviate overcrowding," the Order designated the Commissioner of Corrections as the sole authority empowered to allocate inmates among the various county facilities, and when possible, to move those prisoners to state institutions.[5] The order was to be temporary, lasting only for 90 days or the duration of the emergency. Finally, the Commissioner was ordered to develop an appropriate program to compensate the counties holding state prisoners.

On June 26, 1981, Commissioner Fauver answered Atlantic County's complaint, asserting Executive Order No. 106 as an affirmative defense.[6] On the same day, Commissioner Fauver notified Atlantic County that 35 named state prisoners were to remain in the Atlantic County jail. On July 10 the Commissioner formally designated Atlantic County as the place of confinement for all inmates sentenced to state prison who were then in the Atlantic County jail. On July 7, 1981, Assignment Judge Gruccio transferred the issue of the validity of the Executive Order to the Appellate Division, pursuant to R. 1:1–2. This discretionary referral recognized that "the grave problems that have beset our penal institutions" required "a uniform statewide ruling to guide * * * assignment judges in their decisions on

[5]The Commissioner's discretion to transfer inmates was limited by the injunction that "only prisoners sentenced to a prison or committed to the custody of the Commissioner may be confined to a State Prison."

[6]Defendants also contended at oral argument before the Law Division that the Superior Court lacked jurisdiction to determine the validity of the Governor's Order, since the Commissioner's actions pursuant to that order were final administrative decisions appealable only to the Appellate Division. This contention was rejected by Judge Gruccio in his July 7, 1981 letter opinion, on the grounds that the Executive Order was raised as an affirmative defense. Because plaintiffs had not raised the validity of the order in their complaint, there was no appeal by a party of an administrative determination.

these matters." [7] The trial judge's actions were appropriate under the circumstances.

On September 4, 1981 the Appellate Division, 180 *N.J.Super.* 368 upheld the validity of Executive Order No. 106 and the actions taken by the Commissioner under its authority. On September 11, 1981 Governor Byrne issued Executive Order No. 108, which directed that Executive Order No. 106 remain in effect until January 20, 1982. Because of the dissent below, this case comes before the Supreme Court on appeal as of right. *R.* 2:2–1(a)(2).[8]

## II

Since an unnecessary decision on constitutional issues should be avoided, we initially decide whether the Governor has the statutory power to issue Executive Orders 106 and 108. This involves a determination as to (1) whether the current crisis constitutes an emergency within the meaning of the Disaster Control Act, and (2) whether the means chosen by the Governor to address the emergency are authorized by the statute.

## A

The challenged executive orders rely on the authority of the Disaster Control Act, *N.J.S.A.* App.A:9–30 *et seq.* There is little legislative history to aid in its interpretation. Enacted in 1941, *L.* 1941, *c.* 393, it empowered the Governor to aid the federal government in the war effort. In 1942, the act was broadened to impart wide executive power in providing for civilian defense.

---

[7]On July 8, 1981 Judge Lane denied Atlantic County's application for emergent relief. Justice Sullivan, sitting as a single justice, similarly denied emergent relief. On July 14, 1981 the Supreme Court denied plaintiffs' motion for temporary relief, a stay of Executive Order No. 106, and direct certification pending appeal, and ordered the matter transferred to the Appellate Division for disposition of all issues.

[8]By order dated September 4, 1981 the appeal was accelerated. On September 22, Passaic County was granted leave to intervene.

*L.* 1942, *c.* 250, 251. The scope of the act was subsequently expanded to apply to "any emergency" resulting from natural causes such as fire, flood or earthquake. *L.* 1949, *c.* 86. In 1953 it was further amended to include emergencies resulting from "unnatural causes." *L.* 1953, *c.* 438.

The purpose of the act and the broad powers conferred on the Governor are clearly stated in *N.J.S.A.* App.A:9–33.

> The purpose of this act is to provide for the health, safety and welfare of the people of the State of New Jersey and to aid in the prevention of damage to and the destruction of property during any emergency as herein defined by prescribing a course of conduct for the civilian population of this State during such emergency and by centralizing control of all civilian activities having to do with such emergency under the Governor and for that purpose to give to the Governor control over such resources of the State Government and of each and every political subdivision thereof as may be necessary to cope with any condition that shall arise out of such emergency and to invest the Governor with all other power convenient or necessary to effectuate such purpose.

The Governor's ample powers are further elaborated at *N.J.S.A.* App.A:9–34.

> The Governor is authorized to utilize and employ all the available resources of the State Government and of each and every political subdivision of this State, whether of men, properties or instrumentalities, and to commandeer and utilize any personal services and any privately owned property necessary to avoid or protect against any emergency subject to the future payment of the reasonable value of such services and privately owned property as hereinafter in this act provided.

Finally, the scope of the Governor's authority to issue emergency orders is defined by *N.J.S.A.* App.A:9–45:

> In order to accomplish the purposes of this act, the Governor is empowered to make such orders, rules and regulations as may be necessary adequately to meet the various problems presented by any emergency and from time to time to amend or rescind such orders, rules and regulations, including among other the following subjects:
>
> \* \* \* \* \* \* \* \*
>
> i. On any matter that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property.
>
> j. Such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of this act.

These sweeping provisions reveal three general, pertinent features of the act. First, the act vests the Governor with broad

powers to provide for the health, safety and welfare of the people of the State during any "emergency." *N.J.S.A.* App. A:9–33, –45. Second, these powers include the authority to centralize control over the resources of the State government and its subdivisions, including the counties, "whether of men, properties or instrumentalities." *N.J.S.A.* App.A:9–33, –34. Third, a significant purpose of the act is the prevention of harm to life and property. *N.J.S.A.* App.A:9–33, –45(i).

## B

We now address whether the current prison overcrowding in New Jersey constitutes an "emergency" within the meaning of the Disaster Control Act. Section 33.1 of the act defines "emergency" and "disaster" as used in the statute.

> (1) "Disaster" shall mean any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be handled in its entirety by regular municipal operating services.

> &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

> (4) "Emergency" shall mean and include "disaster" and "war emergency" as above in this section defined. [*N.J.S.A.* App.A:9–33.1(1) & (4) ]

Plaintiffs argue that prison overcrowding is not an "unusual incident." It is not "unusual" because it has been recognized as a major problem as early as 1977. It is also not an "incident" because it is not a "sudden or unforeseen event." *Worthington v. Fauver*, 180 *N.J.Super.* 368, 373 (App.Div.1981) (dissent).

We reject this overly narrow interpretation of the scope of the act. Any grant of executive authority must be construed to accomplish the Legislature's purpose. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562 (1978). This is especially true when those statutes operate to protect the public health, safety and welfare, *see In re Suspension of Heller*, 73 *N.J.* 292, 303–04 (1977), especially during emergencies, *see United States v. Yoshida International, Inc.*, 526 *F.*2d 560, 578 (Cust. & Pat.App.1975).

The gradual broadening of the coverage of the Disaster Control Act from war emergencies to any unusual incident which endangers the public health, safety or welfare evidences a legislative intent to expand the category of events which constitute an emergency. Thus it has permitted the Governor to handle a wide variety of crises, including storms, *e.g.*, Exec. Order No. 12 (Dec. 5, 1974); energy shortages, *e.g.*, Exec. Order Nos. 48, 49 (Jan. 27, 29, 1977); labor strikes, *e.g.*, Exec. Order No. 73 (April 5, 1979); factory explosions, *e.g.*, Exec. Order No. 87 (April 24, 1980); and water shortages, *e.g.*, Exec. Order No. 94 (Sept. 12, 1980).

The Disaster Control Act must be understood in light of its purposes. It sought to protect the public by centralizing control over local government resources in situations whose remedies were beyond the authority and power of local government. A crisis can arise because of a failure to take action. Thus, it is not a necessary component of an "emergency" that it be sudden or unforeseen. Prison overcrowding is closely analogous to the recent water shortages, which arose over time and which were appropriately ameliorated by an emergency executive order. Exec. Order No. 94 (Sept. 12, 1980). The question is not whether the incident emerged suddenly, but whether the scope of the present crisis prevents local governments from safeguarding the people, property and resources of the State.

We further reject the contention that the Governor must wait for a serious disruption to occur in a prison before he would be authorized to take remedial action. The stated purpose of the act is to *prevent* damage from occurring. *N.J.S.A.* App.A:9–33. The definition of "disaster" at *N.J.S.A.* App.A:9–33.1(1) includes not only events that have *resulted* in damage, but "incidents" that prospectively "endanger" the health, safety or resources of residents of the State and that "*may become*" too large in scope to be handled by localized government services. (Emphasis added). Similarly, *N.J.S.A.* App.A:9–45(i) authorizes regulation of "any matter ... that will aid in the prevention of loss to and destruction of property." This language belies any intent by the

Legislature that the Governor must wait for a castastrophe to occur before taking appropriate action to prevent such incidents.

In *State v. Congdon*, 76 *N.J.Super.* 493 (1962), the Appellate Division upheld the power of the executive under the Disaster Control Act to conduct a statewide civil defense practice drill in peacetime, and to require the public to comply with orders given by civil defense officials as part of the drill. "[T]he intent of the Legislature was not to wait until the community had been struck by the holocaust of modern warfare before civil defense measures could become effective." *Id.* at 501.

Recent disruptions in prisons across the country graphically illustrate the destructive potential inherent in prison overcrowding. They entail substantial loss of property and often loss of life. The record below demonstrates that our state and county facilities may be dangerously close to producing such a disaster. The prevention of such an occurrence is clearly a proper subject of executive emergency action under the statute.

To argue that no "emergency" can be said to exist if time remains for legislative action is to make it impossible for the Governor to act to prevent damage before it occurs. In a situation of impending danger, it may be difficult to determine whether the Legislature can be galvanized to act in time to prevent the disaster. Given the legislative goal of preventing damage to life and property, the Governor need not rely solely on a call to legislative action to avert an impending crisis. The Legislature explicitly granted the power to the Governor to act in emergencies to protect the public by preventing damage.

In acting to prevent damage before it occurs, the executive necessarily must make a prediction about the imminence of the danger and the likelihood that a disaster will in fact occur. The Legislature has granted the Governor the power to make such a determination. Nonetheless, this power is not without limit. While a situation of impending disaster may sometimes fall within the statutory definition of "emergency," the statute does not grant the executive the power to label any situation an

"emergency" merely because there is a chance that some kind of disruption will occur in the foreseeable future. There must be a substantial likelihood of occurrence within the immediate future.

Finally, we note that although State officials have been aware of the general problem since 1977, the extent of the current overcrowding is of recent origin. It is largely the result of recent enactments that have increased the number and length of prison sentences and decreased the frequency of parole.[9] Even if the current crisis were due in part to legislative and executive failure to remedy a foreseeable, growing problem, this would in no way deprive the Governor of the power under the statute to protect the public against the disaster it now faces. As the Appellate Division stated, "[P]ointing to prior governmental or societal failure * * * merely states one of several causes for the present emergency; it does not refute its existence nor diminish its presence and the emergent need to solve it." (180 *N.J.Super.* at 379).

There is sufficient evidence in the record to sustain a finding that the problem of prison overcrowding in New Jersey has reached dangerous proportions, and that there is a substantial likelihood of a disastrous occurrence in the immediate future. We therefore hold that the current crisis of prison overcrowding is an "emergency" under the Disaster Control Act and is a proper subject of emergency executive action. We now consider whether the measures taken by the Governor to alleviate that crisis are authorized by the statute.

## C

In reviewing executive actions undertaken pursuant to delegated emergency powers, we must determine whether the actions are authorized by the statute. This involves, first, a determination of whether the Executive Order bears a rational

---

[9] See pp. 188–189 above.

relationship to the legislative goal of protecting the public. Second, the executive action must be closely tailored to the scope of the current emergency situation. "The nature of the [statutory] power determines *what* may be done and the nature of the emergency restricts the *how* of its doing, *i.e.*, the means of execution." *U.S. v. Yoshida Int'l, Inc.*, 526 *F.*2d at 578–79 (emphasis in original).

■ The executive orders in question empower the Commissioner of Corrections to allocate state prisoners to county correctional facilities and to redistribute such prisoners among the counties. These remedial measures are specifically authorized by the Disaster Control Act. The act gives the Governor emergency power to issue orders, *N.J.S.A.* App.A:9–34, and centralize control over the resources of the political subdivisions of the State government, *N.J.S.A.* App.A:9–33. It further authorizes him "to utilize and employ all the available resources of the State Government and of each and every political subdivision of this State, whether of men, properties or instrumentalities * * * " *N.J.S.A.* App.A:9–34. County jails are certainly "resources" of "political subdivisions" of the State within the meaning of the act. The plain language of the statute clearly authorizes the Executive Orders issued in the current emergency.

Plaintiffs argue that because the Atlantic County jail is also overcrowded, it is not an "available resource" that the Governor is authorized to utilize under *N.J.S.A.* App.A:9–34. This argument is without merit. Such a construction of "available resource" would create an exception that devoured the rule. In this era of limited resources, a county government could always claim that its resources were "unavailable" for use by the Governor in an emergency because they were committed to other purposes. The policy behind the Disaster Control Act is to allow centralized control of limited local resources. Implicit in that policy is deference to the Executive's judgment as to what resources are available.

As noted, the Governor's power under the Disaster Control Act must be liberally construed to accomplish its crucial legislative purpose. *See supra* at 194. The act specifically authorizes the Governor "to make *such orders, rules and regulations as may be necessary* to adequately meet the various problems presented by any emergency * * * " *N.J.S.A.* App.A:9–45 (emphasis added). Such regulations may pertain to "any matter that *may be necessary* to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property." *N.J.S.A.* App.A:9–45(i) (emphasis added). This power should not be limited by a technical construction of "available resource" that effectively withdraws emergency authority from the Governor and returns it to local governmental bodies throughout the State.

■ Plaintiffs also contend that the actions taken pursuant to the executive order conflict with two statutes, *N.J.S.A.* 2C:43–10 and *N.J.S.A.* 30:4–6, as interpreted in *Cryan v. Klein*, 148 *N.J.Super.* 27 (App.Div.1977). The *Cryan* decision held that *N.J.S.A.* 2A:164–18, the forerunner of *N.J.S.A.* 2C:43–10, was mandatory, obligating the Commissioner to receive all the counties' prisoners sentenced to a state institution within the number of days stated in the statute. *N.J.S.A.* 2C:43–10(e) states:

In all cases where the defendant, upon conviction, is sentenced by the court to imprisonment, for any term of 1 year or greater, the sheriff of the county or his lawful deputy shall, within 15 days transport him to the State Prison and there deliver him into the custody of the Commissioner of the Department of Corrections. . . .

*N.J.S.A.* 30:4–6 places the same duty upon the Commissioner:

The principal keeper of the State prison and the chief executive officer of each of the other correctional institutions shall receive from the hands of the sheriff or other proper officer every person sentenced to imprisonment in his institution and safely keep him therein according to law and the rules and regulations of the institution until lawfully discharged thereform.

Plaintiffs rely heavily on these two statutes, and the interpretation in *Cryan*, in arguing that Executive Order No. 106 exceeds the statutory power delegated to the Governor by the Disaster Control Act since it suspends these clear legislative directives.

However, the decision in *Cryan* actually supports the validity of the executive order. The Appellate Division reasoned that it was unlawful for the State to delay admittance of prisoners to state institutions since this would cause the counties "to incur expense normally the obligation of the State." *Id.* at 32. The court concluded that *"[a]bsent legislative authority,* there is no basis for the State to foist the care and maintenance of prisoners on the counties." *Id.* at 31 (emphasis added).[10]

Unlike the situation in *Cryan,* the retention of state prisoners in county facilities in this case is authorized by legislative mandate. What distinguishes the instant case from *Cryan* is the existence of an Executive Order based on the legislative authority of the Disaster Control Act. As we have noted, the act explicitly grants the Governor the legal authority to use the available resources of the counties, *N.J.S.A.* App.A:9–34. Further, Exec. Order No. 106 explicitly provides for compensation to the counties for the care and maintenance of state prisoners in county facilities, obviating a major concern expressed in *Cryan.*

To the extent that the executive order suspends the normal operation of the statutes discussed above, it does so pursuant to the emergency powers of the Governor explicitly delegated to him by the Legislature. Such a result is not surprising. "[I]f *every* law applicable to tranquil times were required to be followed in emergencies, there would be no point in delegating emergency powers and no adequate and prompt means for dealing with emergencies." *U.S. v. Yoshida Int'l, Inc.,* 526 *F.*2d at 583 (emphasis in original).

---

[10]One such example of legislative authority was identified by the Appellate Division. The Commissioner has the statutory right to transfer state prisoners to county institutions, as long as this is done with the "consent of the board of chosen freeholders," *N.J.S.A.* 30:4–85.1, and as long as a contract is made with the governing body of the county "for the amount to be paid for maintenance of [state] inmates ... in such county institutions," *N.J.S.A.* 30:4–85, *id.* at 33.

We therefore conclude that the Disaster Control Act grants the Governor power to issue executive orders and to utilize all the available resources of the counties. We further conclude that the executive orders are not in conflict with *N.J.S.A.* 2C:43–10(e) and *N.J.S.A.* 30:4–6.

### D

■ We next consider whether the measures prescribed by these orders are rationally related to the legitimate governmental interest in protecting the public and whether they are closely tailored to the magnitude of the current emergency. *See United States v. Yoshida*, 526 *F.*2d at 578.

There can be no question that centralization of power to allocate prisoners among the various state and county facilities is a rational means of alleviating the problem of overcrowding in our prisons. Since it is undisputed that some county jails have significant excess capacity, it is rational to empower the Commissioner to make use of those facilities to relieve the overburdened prisons. Thus, the measures imposed by the executive orders are clearly related to the statutory ends of protecting life and property.

■ We must determine, therefore, whether the executive orders are tailored to the magnitude of the current crisis. While the Disaster Control Act grants broad authority to the Governor to deal with an emergency, his powers under that statute are not without limit. These emergency powers represent an extraordinary delegation of authority by the Legislature to the Executive. Because of the extraordinary nature of that authority, the executive orders must not only bear a rational relationship to the goal of protecting the public, but their scope must not exceed the extent of the emergency. The statutory validity of executive actions pursuant to emergency power will depend on the nature of the emergency and the gravity of the threat to the public. Thus, a more serious emergency may justify greater responsive measures.

We first address the magnitude of the current emergency. In this case, the danger to life and property posed by the current crisis is of potentially disastrous dimensions. We know this because of recent experience with prison riots in this and other states. On the other hand, this is a situation of *impending* disaster. In those instances where the damage has not yet occurred, the power of the executive will be more limited than when it has already come to pass.

We next address the scope of the power exercised by the executive orders. The emergency measures taken in response to the current crisis were quite limited in scope. The Commissioner has only temporarily superceded the authority of the counties to refuse to hold state prisoners beyond 15 days.[11] We are particularly cognizant of the limited time span involved in these orders. The original order was to be in effect for only 90 days. As matters now stand, the order applies only until January 20, 1982. These time limits appropriately limit the exercise of executive power in light of the predictive nature of the emergency.

Since the threat of damage is extensive and the exercise of emergency power rather limited, it can hardly be disputed that the measures authorized by the executive orders are properly tailored to the magnitude of the current emergency.

### E

■ Finally, we address the statutory validity of Executive Order No. 108, extending Executive Order No. 106 until January 20, 1982.

We have held that the exercise of emergency powers by the Governor is proper when his actions are authorized by the

---

[11]Specifically, three closely related statutes are superseded: *N.J.S.A.* 2C:43–10(e) (mandating that county sheriffs transport state prisoners within 15 days to state prison); *N.J.S.A.* 30:4–6 (ordering the state prisons to receive such prisoners from the hands of the sheriff); and *N.J.S.A.* 30:4–85.1 (disallowing the Commissioner from ordering state prisoners to be held in county facilities without the consent of the board of chosen freeholders).

Disaster Control Act, are rationally related to the goal of protecting the public, and are tailored to the gravity of the emergency. From this analysis it follows that, in the absence of a legislative response, such properly grounded executive actions could continue to be exercised as long as the emergency posed a threat to the public. For this reason, the extension of Executive Order No. 106 is valid.

Nonetheless, we feel compelled to sound a word of caution. If it chose to do so, the Legislature might well determine that permanent centralization of power to allocate state prisoners among county facilities would be an appropriate means of administering the penal system. It could pass a statute to that effect. However, we would hesitate to *infer* such a legislative intent from mere legislative inaction in the face of the continued exercise of emergency power by the Governor. Today we uphold the Governor's actions pursuant to *emergency* statutory authority. We believe, however, that the Disaster Control Act does not permit any delegation of power to the executive to permanently authorize the action taken. Rather, it grants extraordinary power to the executive branch *in time of emergency* to protect the public. From this limited legislative purpose, we infer an obligation on the executive and legislative branches to seek legislative solutions to long-term problems such as prison overcrowding. We fully concur with the admonition of Judge Joelson in his dissent below that it is "the responsibility of the legislative branch . . . to act expeditiously to address a problem within its proper sphere even though that might involve thorny political considerations." (Slip op. at 7).[12]

We express no opinion as to how often the Governor could renew Executive Order No. 106, or the length of time during

---

[12]We note that the Legislature has taken action to address the prison overcrowding situation. Two bills were recently passed by the Legislature and signed by the Governor. The first, *L.* 1982, *c.* 457, appropriates $21.3 million for the construction of a new county correctional facility. The second, *L.* 1982, *c.* 558, authorizes appropriations of $432,000 for 25 temporary

which he could continue to exercise these extraordinary powers, before we would conclude that he had exceeded his statutory authority. *See generally, Deal Gardens, Inc. v. Loch Arbour Bd. of Trustees,* 48 *N.J.* 492, 500 (1967); *Cappture Realty v. Elmwood Park Bd. of Adj.,* 126 *N.J.Super.* 200, 214 (Law Div. 1973), 133 *N.J.Super.* 216, 221 (App.Div.1975); *Meadowland Regional Development Agency v. Hackensack Meadowlands Development Comm.,* 119 *N.J.Super.* 572, 577 (App.Div.1972); *Campana v. Clark Tp.,* 82 *N.J.Super.* 392, 398 (Law Div. 1964). We simply stress that we do not believe that the Legislature intended the Disaster Control Act to operate as a vehicle for a permanent wholesale takeover by the state of county penal facilities. We take particular note of the limited time span of the executive orders. Under the factual situation here, we are satisfied that the extension was well within the Governor's statutory power.

### III

We next address the contention that the Commissioner's actions pursuant to the executive orders have been arbitrary and capricious. It is firmly settled that arbitrary and capricious action by an administrative or executive agency should be overturned. *Henry v. Rahway State Prison,* 81 *N.J.* 571, 580 (1980); *Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 93 (1973); *Campbell v. Civil Service Dept.,* 39 *N.J.* 556, 562 (1963).

The test is essentially one of rational basis. "Arbitrary and capricious action of administrative bodies means willful and unreasoning action, without consideration and in disregard of circumstances. Where there is room for two opinions, action is [valid] when exercised honestly and upon due consideration,

---

positions at Trenton and Rahway State Prisons, $5.2 million for overtime for corrections officials, $11.4 million reimbursement to counties housing state inmates in county facilities, and $1.5 million for the proposed renovation of the Fort Dix stockade for use as a medium-security prison.

even though it may be believed that an erroneous conclusion has been reached." *Bayshore Sewerage Co. v. Dept. Environ. Protection,* 122 *N.J.Super.* 184, 199 (Ch.Div.1973).

On the record in this case we cannot state that the Commissioner's actions pursuant to Executive Order Nos. 106 and 108 have been arbitrary and capricious. While it is true that several county jails are severely overcrowded, the State in recent months has been moving prisoners out of these more crowded county jails. As of September 30, 1981, the Commissioner had removed 76 state inmates from the Atlantic County jail for placement elsewhere in the prison system. The Commissioner has met with the officials of the various counties and is involved in a continuous search for available space. The Commissioner is also in the process of making trailers available to counties for the housing of inmates.[13] Finally, the policy of initially placing inmates in the county where convicted is not arbitrary or capricious even when the county jails are more crowded than the state prisons. Until permanent quarters can be found for those state inmates, it makes sense to confine them in the county jails where they are already incarcerated. Moreover, as testimony indicated, the state prisons present a greater threat of violence because of the larger number of inmates at each facility. Plaintiffs have not met their burden of demonstrating that the emergency actions were without a rational basis.

## IV

The final issue is whether the executive orders violate the constitutional principle of separation of powers under the State

---

[13]On December 4, 1981 the Governor's Task Force on Prison Overcrowding recommended a number of steps to alleviate the situation. The use of vacant or partially occupied state buildings would immediately provide 1,563 additional beds. The diversion of people charged with lesser crimes from prison into alternative programs was also recommended. Finally, the Task Force identified specific state hospitals and jails which could be renovated to provide additional bed space.

Constitution, *N.J.Const.* (1947), Art. III, § 1. This involves consideration of (1) whether the orders represent a usurpation of legislative power by the executive branch; (2) whether the enabling legislation represents an unconstitutional delegation of legislative power to the executive; and (3) whether the legislative delegation of power or the executive implementation of the orders impermissibly encroaches on the proper sphere of the judiciary.

The doctrine of separation of powers is explicitly recognized in the New Jersey Constitution. Art. III, § 1 provides:

> The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

The purpose of the constitutional separation of powers is to prevent oppressive action by the government. Its premise is that the concentration of unlimited power inevitably results in tyranny. Separation serves to "maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent the concentration of *unchecked* power in the hands of any one branch." *David v. Vesta Co.*, 45 *N.J.* 301, 326 (1965) (emphasis in original). The doctrine thus represents a "fundamental and indispensable bulwark against despotism," *Mulhearn v. Federal Shipbuilding and Dry Dock Co.*, 2 *N.J.* 356, 363 (1949).

The purpose of the doctrine is to restrain public power, not to restrict the legitimate operation of representative democracy. Rigid classification of the duties and powers of each branch is therefore neither possible nor desirable. *David v. Vesta Co.*, 45 *N.J.* at 324. As Justice Handler stated in *Knight v. Margate*, 86 *N.J.* 374, 388–89 (1981):

> It occasionally happens that an underlying matter defies exact placement or neat categorization, it may not always be possible to identify a subject as belonging exclusively to a particular branch. In those situations responsibility is joint and governmental powers must be shared and exercised by the branches on a complementary basis if the ultimate governmental objective is to be achieved.

See State v. Leon'ardis, 73 N.J. 360, 370 (1977) (shared judicial and legislative responsibility); In re Salaries Prob. Off. Bergen County, 58 N.J. 422, 425 (1971) (judicial and legislative); Brown v. Heymann, 62 N.J. 1, 10 (1972) (legislative and executive); Mt. Laurel Tp. v. Public Advocate of N.J., 83 N.J. 522, 530 (1980) (legislative and executive); David v. Vesta, 45 N.J. at 324 (executive and judicial).

It is well established that the executive's power to issue an emergency order must stem from an act of the Legislature or from executive authority under the Constitution. Cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952) (federal separation of powers). "Emergency" executive power can be an unconstitutional usurpation of legislative authority either when the executive acts contrary to the expressed or implied will of the Legislature or when the Legislature has failed to act. Id. at 635–38, 72 S.Ct. at 870–871 (Jackson, J., concurring).

Plaintiffs assert that because the executive orders are contrary to N.J.S.A. 2C:43–10 and N.J.S.A. 30:4–6, the Governor has acted contrary to the express intent of the Legislature, and therefore unconstitutionally. However, we have determined that the Governor acted pursuant to the legislative power granted to him by the Disaster Control Act, and this act is not in conflict with those statutes. This delegated authority includes the power to utilize the available resources of the counties.[14] Thus, the executive action is not in derogation of the authority of the Legislature.

The next issue is thus whether the Disaster Control Act itself represents an unconstitutional delegation of power by the Legislature to the executive branch. This requires a determination of whether the delegation impairs the "essential integrity" of the Legislature, In re Investigation Regarding Ringwood, 65 N.J. 512, 527 (1974) (Pashman, J., concurring and dissenting in part),

---

[14]See pp. 188–189 above.

and whether it provides sufficient standards to guide the exercise of delegated power. *Roe v. Kervick*, 42 *N.J.* 191, 232 (1964).

Where the executive acts pursuant to an express or implied authorization from the Legislature, as the Governor has in this case, he exercises not only his own powers but those of the Legislature. In such circumstances the executive action should be "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 *U.S.* at 637, 72 *S.Ct.* at 871 (Jackson, J., concurring) (federal separation of powers). In such a case his actions pursuant to that delegated authority are constitutionally valid as long as he has not exceeded his statutory authority and the government as a whole has the power to act. *Id.* at 637–38, 72 *S.Ct.* at 871. This Court has stated that

we think it enough to ask whether the statute so enhances the executive power as to threaten the security against aggregated power which the separation-of-powers doctrine was designed to provide. We must assume the Legislature found there is no such threat, and we must accept that evaluation unless it is plainly wrong . . . . There being authority to delegate the legislative power, it does not rest with us to quarrel with the legislative decision to make the delegation. [*Brown v. Heymann*, 62 *N.J.* at 10]

In this case, the Legislature has specifically delegated the authority to the Governor to utilize the resources of the counties to protect the public in emergencies. The Legislature retains the power to amend the Disaster Control Act to take away executive power to utilize the county jails in the current crisis. It may also enact legislative solutions to the current problem. Because the Legislature has not relinquished this corrective power, there is no reason to believe that the executive orders have impaired its essential functions. *See In re Investigation Regarding Ringwood*, 65 *N.J.* at 527–28.

 The Legislature may delegate its authority as long as it provides standards to guide the discretionary exercise of the delegated power. *Roe v. Kervick*, 42 *N.J.* at 232; *Mulhearn v. Federal Shipbuilding and Dry Dock Co.*, 2 *N.J.* at 364. Such

standards may be general, *Mount Laurel Tp. v. Public Advocate of N.J.*, 83 *N.J.* at 532, as long as they are as precise and revealing as the subject reasonably permits. *In re Application of Schragger*, 58 *N.J.* 274, 279 (1971). We frequently have upheld statutes delegating broad powers in furtherance of the public health, safety and welfare. *In re Suspension of Heller*, 73 *N.J.* 292, 303–04 (1977); *Burton v. Sills*, 53 *N.J.* 86, 90–91 (1968), app. dis., 394 *U.S.* 812, 89 *S.Ct.* 1486, 22 *L.Ed.2d* 748 (1969). *See also Sprissler v. Pennsylvania-Reading S.S. Lines*, 45 *N.J.* 127, 135 (1965); *Mount Laurel Tp. v. Public Advocate of N.J.*, 83 *N.J.* at 533; *Ward v. Scott*, 11 *N.J.* 117, 123–24 (1952).

The Disaster Control Act delegates to the executive branch the authority to issue emergency orders to protect the public health, safety and welfare. *N.J.S.A.* App.A:9–45, –33. We therefore conclude that Executive Order Nos. 106 and 108 were issued pursuant to constitutionally delegated legislative authority.[15]

Finally, we address plaintiffs' contention that the executive orders represent an unconstitutional interference in the operation of the judicial branch. The executive orders allegedly contradict several court orders mandating that the State take custody of the state prisoners in county facilities under *N.J.S.A.* 2C:43–10 and 30:4–6. Plaintiffs contend that this represents an unconstitutional invasion of the judicial process.

This analysis ignores the existence of the Disaster Control Act. It is incorrect to characterize the situation as a conflict between the executive and the judiciary. The court orders were issued to implement *legislative* authority, as expressed in *N.J.*

---

[15]New Jersey courts have twice upheld the validity of the delegation of authority to the executive in civil defense situations under the Disaster Control Act. *State v. Congdon*, 76 *N.J.Super.* 493 (App.Div.1962); *State v. Natelson*, 21 *N.J.Misc.* 186, 32 *A.2d* 581 (C.P.1943).

*S.A.* 2C:43–10 and 30:4–6. As we have noted, those statutes define the normal relationship between the state and county institutions regarding state inmates. However, the executive orders in this case represent the exercise of legislatively delegated power to alter the normal relationship between the state and county facilities.[16]

Since the current overcrowding in prisons constitutes an emergency under the statute, the executive has acted pursuant to legislative authority. The judicial mandate has not been contradicted, but rather superseded by the exercise of delegated authority. There has thus been no unconstitutional interference by the executive in the judicial process.

## CONCLUSION

We conclude that the temporary emergency executive orders are authorized by the Disaster Control Act, *N.J.S.A.* App.A:9–30 *et seq.,* and they do not violate the constitutional doctrine of separation of powers. We further hold that the Commissioner's actions pursuant to those orders have not been arbitrary and capricious. For the foregoing reasons, the judgment of the Superior Court, Appellate Division, is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For reversal*—none.

---

[16]This Court has invalidated a statute that gave an administrative official the power of a magistrate. *State v. Osborn,* 32 *N.J.* 117 (1960). The act represented a delegation to executive officers of judicial power and thus violated the separation of powers doctrine. This case is clearly distinguishable. These executive orders do not adjudicate the rights of individuals but invoke emergency powers to centralize control of local government resources. They are therefore invoking legislative rather than judicial powers.