236 N.J. Super. 406 (1989)
566 A.2d 191
GERALDO MORALES, ET AL., PLAINTIFFS-RESPONDENTS,
v.
COUNTY OF HUDSON, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 1989.
Decided October 23, 1989.
*408 Before Judges PETRELLA, HAVEY and STERN, JJ.
Mark Morchel, Deputy County Counsel, argued the cause for defendant County of Hudson (Robert E. Barry, Hudson County Counsel; Margaret McKenna, Assistant County Counsel, on the brief).
Catherine Brown, Deputy Attorney General, argued the cause for defendants Department of Corrections and William H. Fauver (Peter N. Perretti, Jr., Attorney General; Michael R. Clancy, Assistant Attorney General, of counsel; Catherine Brown on the brief).
Howard Moskowitz argued the cause for plaintiffs (Jesse Moskowitz, attorney; Howard Moskowitz on the letter brief).
Nancy Feldman, Assistant Deputy Public Defender, argued the cause for Public Advocate, Amicus Curiae (Alfred A. Slocum, Public Advocate and Public Defender, attorney; Nancy Feldman, Assistant Deputy Public Defender, of counsel and on the brief).
Cindy Nan Vogelman argued the casue as Amicus Curiae appointed by and for the trial court (Chasan, Leyner, Tarrant, Loftis & Lamparello, attorneys; Cindy Vogelman, of counsel and on the brief).
Town of Secaucus filed a brief as Amicus Curiae (Holland & Holland, P.C., attorneys; Frances C. Holland, on the brief).
The opinion of the court was delivered by STERN, J.A.D.
*409 The Department of Corrections (DOC) and its Commissioner appeal, pursuant to leave granted, from portions of a post-judgment order entered July 20, 1989 requiring him to "temporarily transfer" 100 county sentenced inmates "from the Hudson County Pavonia Avenue Jail to a state or other county correctional facility." The County of Hudson appeals from portions of the same order which placed it "under the obligation to undertake the construction of additional Correctional Facilities."[1] We denied stays pending appeal by the Commissioner and the County, as did the Supreme Court. However, we consolidated and accelerated the appeals.
Subsequently, the Commissioner constructed and opened a facility in Secaucus, known as "Tent City", where up to 100 county inmates of the Hudson County Jail (and at times greater numbers) have been housed since August 16, 1989. On September 1, 1989 the trial judge ordered the Commissioner to "use his best efforts to keep a population of approximately 100 inmates in the tent facility established by the Commissioner." On motion of the Commissioner we declined to close the facility but ordered a staged attrition based on the parole, completion of sentence or release of inmates transferred there. We also denied a motion filed on the eve of argument by amicus curiae, appointed by the trial court "to represent the criminal justice *410 system,"[2] to remand this matter so that the trial judge could order the Commissioner to review the County's proposed amendments to his construction plan. That plan, approved by the trial judge in the July 20, 1989 order, required construction by the County of the additional correctional facilities.

I.
This matter, originally initiated as a class action by inmates of the Hudson County Jail on Pavonia Avenue in Jersey City (hereinafter "jail" or "Pavonia Avenue Jail") in or about 1981, is based on their claim that severe overcrowding and other deficiencies in the jail violated their constitutional rights.[3] After a trial Judge Gregory J. Castano's written decision on May 19, 1982 found that the conditions in the Jail were "intolerable and shocking to the conscience" and constituted an "infringement of the constitutional rights" of the inmates.
In concluding that "judicial intervention in this case has become indispensable," Judge Castano further noted:
courts in the first instance will always defer to local governing authorities in the administration of their prisons, but if the institution does not conform to constitutional minima and the authorities do not act, the court must put aside that deference and take whatever steps may be necessary to remedy the violations. [citing Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)].
Judge Castano held that the jail originally designed for 280 inmates, but then containing 553 inmates (including pretrial *411 detainees)[4], would have to be closed no later than June 1, 1987 if the conditions were not corrected. Jurisdiction was retained by the trial court "to monitor compliance" with its order while the County constructed "a new jail facility" and renovated the existing jail "in conjunction with the new facility" or implemented "any reasonable alternative."
On March 8, 1983, upon denying a motion for direct certification of an appeal, subsequently dismissed as moot, the Supreme Court entered an order remanding this matter to the trial court, for the limited purpose of conducting hearings to determine a schedule of temporary inmate removal to permit the completion of a fire and life safety system at the jail and authorizing a trial court order directing the removal of "49 State-sentenced inmates" to the custody of the Commissioner of Corrections.
Despite the trial court's continuing supervisory efforts in this matter, the County has failed with sufficient speed to remedy the unconstitutional conditions which have magnified at the jail.[5] On January 22, 1987, Judge Burrell Ives Humphreys, who subsequently took over responsibility for post-judgment proceedings, concluded that "the repeated failures and laxity of county officials ... can simply not be permitted to continue". On February 4, 1987 he entered an order directing the county "to treat the jail construction and renovation project as urgent and to pursue it with diligence and expedition". Thereafter, plans for the construction of a new jail facility in Kearny, now scheduled to be completed in 1991, were finalized.
It is undisputed that the population of the Pavonia Avenue Jail has substantially increased since 1982, and it can hardly be *412 debated that that facility has been overcrowded at all relevant times.[6]
The worsening conditions at the Pavonia Avenue jail, originally documented in the findings of Judge Castano (including a lack of medical and recreational facilities, an inadequate infrastructure, years of deferred maintenance and a burgeoning population) resulted in an even greater level of overcrowding than had been determined to be unconstitutional in 1982. The consequent deterioration of conditions were discussed at various status conferences held in this matter before Judge Humphreys in 1988 and 1989. As a result of the alarming increase in the jail population, Judge Humphreys held an emergency hearing on September 23, 1988 and found that "[e]mergent and dangerous conditions exist [that] unless promptly remedied pose a serious risk to public safety and well-being of the correction officials... and inmates at the jail."
By order dated October 14, 1988, Judge Humphreys ordered implementation of emergency measures, including transfer of inmates from Pavonia Avenue to the Annex in Secaucus, temporary assignment of judges to the criminal division, review of bails by the Prosecutor and relocation of offices at the jail to provide additional space for inmates. That order further provided that the DOC was to remove all state-sentenced inmates *413 from Hudson County.[7]
Pursuant to the same order, the County was further directed to expedite the acquisition and use of additional trailers at the Jail Annex in Secaucus and to immediately search for additional facilities to house inmates on an emergency basis. After another hearing on October 28, 1988, the County was further directed on November 2, 1988 to search for additional custodial facilities for 250 to 350 prisoners "to be made ready for use as soon as possible." In response, the County proposed the construction of prefabricated jail units on an expedited basis on the site where the new jail is being constructed in Kearny. That proposal was approved on January 24, 1989 and that facility is now scheduled to open later this month.[8]
On November 2, 1988, Judge Humphreys also ordered DOC to inspect the Pavonia Avenue Jail and provide a report to the court on the conditions there and on the maximum number of prisoners that it could hold. In a memorandum, dated November 7, 1988, the DOC reported that 546 is the "maximum number of inmates who can be housed without, in the words of the court order, `violating minimal standards of human decency.'" At the time of this recommendation the population of the jail was approximately 675. In addition, the DOC report noted that 546 could be housed there only if repairs were made in the areas of plumbing, electrical systems, sanitation and fire safety; proper supervision, management and maintenance were instituted; every inmate received a bunk; recreation was provided daily and prisoner discipline was maintained. It was also *414 noted that the conditions at the jail had deteriorated since the last DOC inspection eleven months earlier.
Despite additional emergency measures instituted to expedite processing of cases within the Hudson County Criminal Justice system, the jail population continued to climb. By March 17, 1989 the population reached 728.
After a hearing on May 18, 1989, Judge Humphreys found that an emergency existed at the Pavonia Avenue Jail due to the existing conditions. He specifically found:
The jail population will likely rise substantially between now and October [1989], when the new 300 bed facility will be ready. The question therefore is whether this continued and increasing unconstitutional overcrowding can and should be tolerated between now and October. The court concludes it should not.
Unconstitutional overcrowding for that period of time, coupled with the long period of time that has already passed, is grossly unjust. Moreover, it is dangerous to inmates and to correction officials at the jail. It poses a clear and substantial risk of serious disturbances at the jail with a consequent potential for loss of life and property.
In his opinion, the judge determined that the Commissioner has the legal authority and duty to act upon a showing that a county jail "is in willful and continuous disregard of the [Department's] minimum standards for such facility," N.J.S.A. 30:8-57, and that "[t]he Commissioner's continuing failure and refusal to act is arbitrary, unreasonable and capricious." The judge rejected a jurisdictional attack on his authority to review state administrative action, citing numerous orders entered in the case requiring DOC action without challenge by appeal.
In accordance with his May 18, 1989 opinion, Judge Humphreys directed the Commissioner to provide the trial court, within ten days, with a plan for a phased reduction in the inmate population of the Pavonia Avenue Jail to a "constitutional level" of 546 inmates. This was to be accomplished through the relocation of inmates to other state or county correctional facilities or by directing the County to provide additional facilities on an emergency basis.
*415 The DOC devised a plan as directed by the court. The plan, which was submitted on June 6, 1989, called for the County to accelerate the construction of the prefabricated jail units in Kearny by using 24-hour shifts and weekend work, and to build a new modular jail in Secaucus near the Annex. The plan listed various factors, including rejection of other alternatives, in support of the recommendation.[9]
Before the court could review the plan, new factual information was presented by the prosecutor indicating that the overcrowding at the Pavonia Avenue Jail was going to be much more severe than anticipated. According to the prosecutor, the increased disposition rate was going to cause the jail population to rise dramatically over the summer until, if no action was taken, the population could reach as high as 1400. In light of this new information, the DOC was directed to reassess its plan submitted pursuant to the May 18, 1989 order.
The revised plan, dated June 27, 1989, continued to call for the County to accelerate construction of the prefabricated jail or "modular units" in Kearny, now scheduled for completion this month. However, the new plan also required the County to install individual trailers within 30 days at "Warehouse 77," a federal facility in Kearny to be conveyed to Hudson County, and in Secaucus, in place of the proposed modular units to be constructed in Secaucus, as the June 6th plan had required. *416 Absent from the Commissioner's plan was any action relating to the relocation of Hudson County's excess jail population to other penal facilities in the interim.
Evidentiary hearings were held to determine whether DOC's revised plan was a feasible and effective response. In his testimony, on July 10, 1989, Assistant Commissioner Gary Hilton (Hilton) confirmed that the DOC accepted the May 18, 1989 order as significantly redefining its responsibility to county jail inmates and that its plan for the County was prepared pursuant to that order.
Hilton testified that state correctional facilities are currently operating at 118% of capacity. He acknowledged that the Pavonia Avenue jail is an "older facility", which is "clearly one of the more crowded facilities" in the state, but emphasized that there were other county facilities "as crowded". Hilton also stated the need for a statewide DOC policy "equally available and accessible to all counties." He indicated that "any County would expect an evenhanded and ... equal treatment and equal consideration and equal entitlement from the Department of Corrections." Thus, he testified that DOC feared that the transfer of county inmates from Hudson County to state facilities would set a "catastrophic" precedent which,
could not be equally and equitably extended to all other Counties, who have, by whatever methods and remedies, have managed their County populations. It would be a policy that would be unique to this particular setting and we cannot view the Hudson County situation with perhaps the same parochial eye that some might.
During the course of this hearing, Hilton was also questioned regarding DOC's willingness to provide Hudson County with emergency temporary staffing assistance for additional county facilities, and he stated:
If the County were to make such a representation it would be evaluated by the Department and it would be given careful deliberation. And again, the kind of service we are prepared to offer Hudson has got to be the kind of assistance and service that we are prepared and able under the circumstances to offer other Counties.
Later, Hilton indicated that
... the Department would certainly be willing and able to assist the County in upgrading, improving, expediting its recruiting process. The State, or the *417 Department would certainly come in and provide technical assistance in terms of evaluating shift coverage and perhaps moving to 12 hour shifts. The Department might come in and assist the County in evaluating supplementing its force with some kind of security personnel in certain areas. Yes, we would be willing to do that for Hudson as we would be prepared to do that for any County.
Testimony was presented at a July 11, 1989 hearing regarding the feasibility of constructing additional trailer facilities on various sites in Hudson County. The corrections architects produced by both the County and the State disagreed regarding the number of days necessary to construct additional interim trailer facilities. The DOC expert stressed that the emergency housing could be made ready in 30 days, while the County expert opined that "approximately two to three months" was more realistic. However, both witnesses agreed that, with the requisite number of dollars available, additional construction could be completed in Hudson County in a limited period of time.
On July 12, 1989, Hudson County Chief Warden Larry A. Butler testified about staffing difficulties which he had encountered with respect to the Pavonia Avenue Jail, the Secaucus Annex, and prospectively, for the modular facility to be opened in Kearny. According to Warden Butler, based on staffing shortages which have been experienced in the past with respect to Hudson County Jail facilities, they would be unable from a security viewpoint to commence operations of additional facilities at the Secaucus Jail Annex or at Warehouse 77 within a month or two.
In an opinion rendered July 19, 1989, Judge Humphreys made the following findings:
The inmate population of the Pavonia Avenue jail has continued to increase since the court's decision of May 18, 1989. The Prosecutor projects that the population will increase by 200 inmates a month from now until October. The Hudson County Trial Court Administrator also projects substantial increases. All parties were given a full opportunity to challenge or question these projections. No one did so.
The administrative measures ordered by the court will not offset these projected increases.

*418 Immediate action must therefore be taken not only to implement the court's May 18, 1989 decision providing for a phased reduction in the inmate population, but also to avert a potential catastrophe caused by the projected increases in the inmate population. (emphasis added)
The court thereupon on July 20, 1989 ordered the County, with the Commissioner's "full and ample assistance ... not necessarily [to] be limited to technical and advisory assistance", to comply with DOC's plan that it build additional facilities in Secaucus and at the Kearny warehouse. However, the court emphasized that this action alone would not relieve the immediate emergency because this new housing could not be ready before 30 days at the very earliest. Accordingly, the court found that DOC's plan was "patently and fatally flawed in ... its failure to provide for relocating some inmates." DOC's failure to respond to the immediate crisis was found to be "arbitrary, unreasonable and capricious and represents a clear abuse of [the Commissioner's] authority and discretion."
The judge stressed that the DOC's "failure to relocate prisoners ... poses unacceptable risks to public safety and unnecessarily and wrongly prolongs the dangerous and unconstitutional overcrowded conditions at the jail." The Court found that in contrast to the immediate danger facing the Hudson County Jail, "relocation by the Commissioner of a relatively small number of inmates for a relatively short period of time will not overtax state facilities or other less crowded county facilities." As a result, the DOC was ordered to transfer 100 inmates from Pavonia to state or other county facilities within ten days, thus generating this appeal by the Commissioner and DOC[10] and the *419 County's appeal from the direction to build the additional facilities.
Following the denial of its application for a stay, the DOC proposed that, instead of transferring inmates from the Pavonia Avenue Jail to state or other county facilities, it would erect and staff, at the County's expense, a tent encampment ("Tent City") for 100 inmates on County land. In an order issued August 10, 1989, Judge Humphreys concluded that this proposal was "a reasonable and constitutional compliance with this Court's order of July 20, 1989, and said proposal is thereby approved." The County was ordered to reimburse the State for the actual cost of housing County inmates and ordered to pay the State $175,000 immediately to cover the costs of "Tent City". On August 16, 1989, "Tent City" began housing approximately 100 Hudson County inmates. As previously noted, on September 1, 1989, DOC was ordered to use its "best efforts" to keep the "Tent City" population at 100 at all times, and we have stayed that order to permit a reduction of that population by attrition.

II.
We disagree with the trial judge to the extent he determined that N.J.S.A. 30:1B-1 et seq., enacted after MacNeil v. Klein, 141 N.J. Super. 394 (App.Div. 1976), certif. denied, 72 N.J. 455 (1977), 30:4-85.1, 30:8-57 et seq., 30:8-16.1 et seq., and particularly N.J.S.A. 30:8-58, can be read to require the Commissioner to accept custody of county sentenced inmates in these circumstances. The statutes and Executive Order 106 permit the Commissioner to take certain action as specified in each. The Commissioner acknowledged before us that he has *420 discretion, under circumscribed circumstances, to accept or transfer custody of inmates sentenced to county facilities. See N.J.S.A. 30:4-85.1; N.J.S.A. 30:8-57, 30:8-58; see also N.J.S.A. 30:1B-1 et seq.; State v. Hughes, 230 N.J. Super. 223, 231-232 (App.Div. 1989). He contends that this discretion is his alone and can be reviewed only by an appellate court and only on a limited scope of review.
We initially reject, in the circumstances of this case, the challenge by the DOC and Commissioner to the jurisdiction of the trial judge to order the Commissioner to accept "temporary transfer" of county inmates. Under our Constitution, N.J. Const. (1947), Article VI, § 5, ¶ 4, review in lieu of prerogative writs "shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court...." The Chancery Division and Appellate Division are both parts of the Superior Court, and the issue deals with adherence to the governing rules which can be relaxed in extraordinary circumstances to avoid injustice. R. 1:1-2.
Under R. 2:2-3(a), the Appellate Division has been given jurisdiction to review actions and decisions of state administrative agencies. See, e.g., Pascucci v. Vagott, 71 N.J. 40, 51-52 (1976). However, here the trial judge was dealing with proceedings ancillary to the Chancery Division's determination that the Hudson County jail conditions are unconstitutional. The Commissioner and DOC were defendants from the beginning in this case and apparently never sought to challenge, at least by appeal, any jurisdictional issue with respect to the ancillary powers of the trial court prior to entry of the July 20, 1989 order. In fact, pursuant to orders of the trial court, the Commissioner and DOC presented plans designed to help alleviate the overcrowded jail conditions in Hudson County. In the words of the Commissioner and DOC, "... in a good faith exercise of one of the [Commissioner's] powers identified by the court, the Department submitted a plan to have the County build additional beds." The "jurisdictional" question now *421 arises only because the court, in reviewing the plan, concluded that the Commissioner must accept temporary transfer of county inmates while the construction plan is being implemented.
In any event, irrespective of whether the trial court had authority to review the Commissioner's action or inaction, it cannot properly be concluded on this record, as it must in order for a court to overrule the Commissioner's exercise of discretion, that his present determination not to accept transfer of county inmates is arbitrary, capricious or unreasonable or that it violates legislative policies expressed or implied. See Clowes v. Terminix Intern. Inc. 109 N.J. 575, 586-589 (1988); Worthington v. Fauver, 88 N.J. 183, 204-205 (1982); Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980); Campbell v. Dept. of Civil Service, 39 N.J. 556, 562 (1963). This is particularly so since the Commissioner here was applying his special expertise in administering a statewide correctional policy. See e.g., In re Promulgation of Guardian Services Reg., 103 N.J. 619, 626 (1986); Mayflower Securities Co. v. Bureau of Securities, 64 N.J. 85, 93 (1973).
It is clear that the county is responsible for housing inmates sentenced to county jails. This includes all non-indictable offenders, defendants sentenced for less than one year in custody and defendants placed on probation with up to 364 days in custody. See e.g., N.J.S.A. 2C:43-10; N.J.S.A. 30:8-16.1 et seq., N.J.S.A. 30:8-19. In addition, pretrial detainees are housed in the county jail. Further, the Governor's Executive Order, permitting the Commissioner of Corrections to house prisoners at county facilities due to prison overcrowding does not require or warrant a holding that the Commissioner must or should accept custody of inmates sentenced to county facilities for up to twelve months due to overcrowding in the local facilities. See Worthington v. Fauver, supra.[11]
*422 The Commissioner's decision, at least to date, cannot be considered unreasonable since he relies on a lack of space in overcrowded state facilities to accept the transfer of county inmates. He also has legitimate concerns that accepting those inmates would, in essence, invite other trial court judges in other counties to solve the overcrowded conditions in local jails by directing him to accept the transfer of prisoners to institutions which must remain secure and with respect to which the Legislature has provided for the commitment of indictable adult offenders sentenced to more than twelve months in custody. See e.g., N.J.S.A. 2C:43-10a, e; 30:1B-8. Cf. State v. Falcone, 211 N.J. Super. 685 (App.Div. 1986) (reversing trial judge order for accelerated transfer to ADTC). We recognize that offenders sentenced to State custodial institutions are those convicted of more serious crimes, including crimes of violence. Thus, overcrowding among such prisoners at State correctional facilities pose significant risks about which the Commissioner in the exercise of his jurisdiction must be most concerned. As noted in N.J.S.A. 30:8-16.4 the Legislature has declared that "those offenders [with] demonstrated propensity to violence" should be separated from "offenders who can be dealt with more effectively in county correctional facilities." See N.J.S.A. 30:8-16.1 et seq.; Worthington v. Fauver, supra.
In testifying before the trial judge, Assistant Commissioner Hilton made clear that the DOC had to implement a policy which is applicable uniformly with respect to all counties and that, in any event, there was no bed space available within State correctional facilities in which to reallocate county prisoners. Further, in presenting the plan in accordance with the trial court's May 18, 1989 order, the Commissioner, in formulating his plan, considered such factors as the detention status of the inmates, statewide policy-making ramifications from transferring inmates to other counties, the fastest available means *423 for securing additional bedspace and potential site locations for additional facilities.
As stated in Worthington v. Fauver, supra, 88 N.J. at 204-205:
`Arbitrary and capricious action of administrative bodies means willful and unreasoning action, without consideration and in disregard of circumstances. Where there is room for two opinions, action is [valid] when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.' Bayshore Sewerage Co. v. Dept. Environ. Protection, 122 N.J. Super. 184, 199 (Ch.Div. 1973).
Applying that standard here, we find no abuse of discretion.
At oral argument before us, it was represented, without contest by any party or amicus, that when the "modular facility" is opened during the week of October 23, 1989, the remaining inmates of "Tent City" will be transferred there and "Tent City" will close. The plaintiffs and Public Advocate join the County in contending therefore that the DOC and Commissioner's appeal should be deemed moot. As the parties do not contest that the opening of the modular facility will provide the bed space in place of, not in addition to, "Tent City," we see no need to address further any other issue raised on the appeal of the Commissioner and DOC.

III.
We reject the County's argument that the Chancery Judge was not empowered to direct it to build additional facilities. The Commissioner, DOC and plaintiffs contend that the trial judge has the power to make such a direction to implement a remedy following the declaration of unconstitutional conditions at the Hudson County Jail, citing Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) and Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), reh'g den. 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); see also Robinson v. Cahill, 69 N.J. 133, 153 (1975), cert. denied 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975), 69 N.J. 449 (1976), 70 N.J. 155 (1976), injunction dissolved, 70 N.J. 464 (1976). Amicus curiae, however, argues that the trial judge merely *424 directed implementation of the plan prepared by the Commissioner pursuant to his statutory jurisdiction.[12] According to administrative regulation N.J.A.C. 10A:31-5.1, the Commissioner may "initiate such legal action as he may deem necessary to ensure enforcement" of rules and regulations the Legislature authorized him to promulgate to provide the appropriate "care, treatment, government and discipline" at county correctional facilities. See N.J.S.A. 30:1B-10. See also N.J.S.A. 30:8-57.
We do not decide the basis for the trial judge's order because, before us at oral argument, the County very responsibly acknowledged its obligation to construct adequate county correctional and penal facilities. It also acknowledges that the County had adequate notice about the need to construct more facilities at least since 1982 when Judge Castano's opinion was rendered[13] and that, in any event, the trial judge has legal *425 authority to order the construction of additional facilities in order to implement the original judgment after more than five years have passed.[14] The County's present argument is only that, factually, it should not have been compelled on July 20, 1989 to build even more facilities because the jail population crisis will be resolved by the opening of the new jail in 1991 and in the interim by the modular facility this month and by other action of the County. While the trial judge has continuing jurisdiction to review the totality of facts in light of recent developments, we conclude that the record justifies his conclusion that the construction of additional jail facilities in Hudson County was necessary. That portion of the order of July 20, *426 1989 challenged on the County's appeal is affirmed.[15]

IV.
Our decision today prevents the trial judge from ordering the transfer to the custody of the Commissioner and DOC of inmates sentenced to a county, not state, facility. In no other respect do we limit his power to take appropriate action to reduce the population of the Hudson County Jail. We recognize that by the closing of "Tent City", which we expect will involve an orderly retransfer of prisoners, the population crisis at the Pavonia Avenue jail may become greater if the modular facility now projected to partially open during the week of October 23, 1989 is not completed by then, or if the facilities which the judge ordered the County to construct on July 20 (or any amendment of that plan) is not completed on an expedited basis. However, the Legislature has carefully detailed a statutory pattern whereby offenders sentenced to one year or more and those sentenced to less than one year in custody are generally to be housed in different facilities. Obvious reasons for the distinction turn on the need for different security and the like. If the overcrowded condition at the Pavonia Avenue Jail leads the Commissioner to take action to cease admissions and transfer inmates, pursuant to N.J.S.A. 30:8-57 and 30:8-58, or a state or federal court to cap admissions to the Hudson County Jail at a certain level, that will flow from the inaction with respect to adequate facilities in that county for much of *427 the last decade.[16] We fully recognize that the trial judge has endeavored to design and implement plans to minimize, consistent with public safety, the jail population at Pavonia Avenue. We commend his efforts to remedy the situation in Hudson County, but hold that he cannot remedy that situation by directing, at least in these circumstances, the Commissioner of the Department of Corrections to devote and assign state correctional facilities and resources to inmates sentenced to a county institution.
The order directing the Commissioner to accept "temporary transfer" of county sentenced inmates is reversed, and the order directing the County to build additional facilities, subject to further review based on recent developments and proposed amendments to existing plans, is affirmed.
NOTES
[1] We bypass whether the County's appeal is from a final judgment appealable as of right. We also bypass all issues concerning review of orders which have not been the subject of motions for leave to appeal. In our July 28, 1989 order denying the stay applications we expressly provided that "Judge Humphreys shall continue to exercise supervisory jurisdiction over the County's construction endeavors to alleviate overcrowding with respect to County prisoners." Because of the crisis which has been generated by the inadequate correctional facilities in Hudson County, we bypass the procedural questions noted in an effort to dispose of the important public issues raised in the numerous briefs filed with us as expeditiously as possible.
[2] There are three amici on the appeal in this case, the Public Advocate-Public Defender, the Town of Secaucus and the amicus appointed by the trial court to represent the criminal justice system. In this opinion our reference to the "amicus" is to counsel representing the criminal justice system unless our reference is to another specific "amicus."

The Commissioner and DOC have objected to the role of the trial court administrator and, to a lesser extent, the amicus curiae representing the criminal justice system in this case. In light of our disposition we do not comment in any way about their roles.
[3] The original plaintiffs have long since served the sentences for which they were confined when the suit was instituted.
[4] According to Judge Castano's opinion, the jail was constructed in 1926 and contains 187 cells, generally 5' X 7 1/2' in size. The regulations then and now require a minimum of 70 square feet for each single occupancy cell. N.J.A.C. 10A:31-2.8(a)(4).
[5] A "temporary" trailer facility had been opened in Secaucus after entry of Judge Castano's order.
[6] Overcrowding problems transcend the county jail situation. We can take judicial notice that although Hudson County may be the smallest in land area of New Jersey's 21 counties, 46.42 square miles of land, it is by far the most densely populated. According to State Department of Labor estimates as of July 1, 1988 the population density of Hudson County is about 11,650 people per square mile of land. This is in the face of declining population since the 1970 census, although there may be people not accounted for in the population estimates. Four of Hudson County's 12 municipalities have population densities which exceed 30,000 people per square mile: West New York (43,779); Union City (38,192); Guttenberg (35,350); and Hoboken (32,178). See footnote 13, infra.
[7] At oral argument it was represented that in Hudson County State sentenced inmates are transferred to the custody of the Commissioner of Corrections within 15 days of sentencing. See N.J.S.A. 2C:43-10e.
[8] When the briefs filed with us were prepared, that "modular facility" was scheduled to partially open on October 9, 1989. We have now been informed that the opening has been delayed two or three weeks until sometime during the week of October 23, 1989.
[9] In the letter, DOC stated "The Department respectfully advises the court that it does disagree with the court regarding the court's finding as to the legal appropriateness of the Department's actions in handling this overcrowding problem. At this juncture, however, the Department believes it is in the best interests of all concerned to focus upon a solution to Hudson County's overcrowding problem. The Department, therefore, wishes to reserve its right to an evidentiary hearing on the question of whether the Commissioner's actions in handling the overcrowding problem in this State and in Hudson County have been arbitrary, capricious and unreasonable" and "reserves its legal rights with respect to the legal basis" with respect to "directing the Commissioner to relocate county prisoners to other state or county facilities or, in the alternative, directing the Commissioner to implement a construction plan for a county and compel enforcement of same."
[10] In denying their application for a stay we said:

The stay requested by the Department of Corrections is likewise denied, it being the understanding of this court from the opinion of Judge Humphrey's that the State Department of Corrections has been ordered to relocate 100 County prisoners to other county facilities or accept them into State emergency facilities on a temporary 30-day basis only, while the county constructs its own temporary emergency facilities to accommodate these prisoners. Our order denying the stay is based solely upon the comprehensive factual findings of emergency made by Judge Humphreys and the State's responsibility to provide bed space to alleviate these conditions until the County can discharge its primary duty to house these County inmates. Judge Humphreys shall continue to exercise supervisory jurisdiction over the County's construction endeavors to alleviate overcrowding with respect to County prisoners." (emphasis added)
[11] We are advised that Hudson County no longer has a workhouse or penitentiary and that, therefore, prisoners can be sentenced to a county facility in Hudson County for up to one year, and not eighteen months. See N.J.S.A. 2C:43-10a, b, c, f, g.
[12] As previously noted, the Commissioner did not seek leave to appeal or challenge the trial judge's jurisdiction to request or direct that DOC prepare a plan and revised plan.
[13] Within one year of adoption of the Code of Criminal Justice, our Supreme Court made clear that "Code sentences frequently require more time to be spent in custody because of presumptive terms ... and use of parole ineligibility terms...." State v. Maguire, 84 N.J. 508, 530 (1980). In 1981, the Legislature amended N.J.S.A. 2C:43-6 and 2C:43-7 to require mandatory sentences, with mandatory parole ineligibility terms, for offenders who commit certain offenses with firearms and simultaneously made the parole ineligibility term applicable to "any crime". See. N.J.S.A. 2C:43-6, 2C:43-7; see also State v. Flippen, 208 N.J. Super. 753 (App.Div. 1986). The same year, the Legislature amended N.J.S.A. 2C:44-1d to make clear a "presumption of imprisonment" for all defendants convicted of first and second degree crimes. Referring to the report of the Governor's Task Force on Prison Overcrowding filed in December 1981, our Supreme Court in 1982 again made clear the impact of the Code in terms of prison population by virtue of the "real time" to be served. See Worthington v. Fauver, supra, 88 N.J. at 189, n. 2. Subsequently, the Legislature adopted the Comprehensive Drug Reform Act of 1986, effective June 22, 1987, and operative July 9, 1987, which contains mandatory custodial sentences and ineligibility terms in certain cases. N.J.S.A. 2C:35-1 et seq. Hence, it was clear from the effective date of the Code of Criminal Justice, just over ten years ago on September 1, 1979, that legislative provisions with respect to sentencing would increase the population of correctional facilities. Certain legislation with respect to sentencing made clear that the sentence population of county facilities would increase as did the state prison population by virtue of either mandatory sentencing or the length of time to be served in a county correctional facility. See, e.g., N.J.S.A. 2C:11-5b with respect to minimum service for death by auto, and the 1983 amendments to N.J.S.A. 2C:43-2b and 2C:45-1c, L. 1983, c. 124, §§ 1 and 2, which increased the maximum custodial period to be served as a condition of probation from 180 to 364 days, in part to permit the sentencing to the county level of certain prisoners who would otherwise go to state prison. Further, the Legislature adopted the "County Correctional Policy Act of 1982" to promote construction of adequate county facilities. See N.J.S.A. 30:8-16.1 et seq., 30:8-16.4. Against this background, it can hardly be contended that the Legislature did not intend the county governments to establish facilities necessary to house inmates sentenced to county facilities in accordance with the provisions of Title 2C, Title 24 (since repealed), Title 39 (motor vehicles) and other statutes of this State. Further, while criminal cases were commenced against 3,531 defendants in Hudson County in the 1982-83 court term, that number has increased to 13,168 in the last term. Over the last ten years, the number of indictments returned against defendants rose from 1988 to 9641.

This is not to say that increases in correctional population are solely a result of legislative action which was itself a reaction to what was happening in society and the increase in crime. The causes of crime and social disorder are well beyond the controversy before us, but we cannot but note that increasing urbanization, increased population densities and overcrowding, as well as societal changes, have all had impact.
[14] The County has apparently abandoned its separation of powers argument which generally relates to the three branches of State government. See N.J.S.A. Const. (1947), Art. III, ¶ 1.
[15] We reject in these emergent circumstances the contention raised by amicus Town of Secaucus, but not the Hackensack Meadowlands Development Commission, that the Commission's zoning approval was necessary for the construction of additional correctional facilities. See Mayor and Council of Kearny v. Clark, 213 N.J. Super. 152 (App.Div. 1986). In any event, we note that the issue will be rendered moot by the closing of "Tent City", to the extent that the contention relates to that facility.
[16] It would be an intolerable suggestion that judges should disregard their sworn obligation to impose appropriate sentences upon conviction. Nevertheless, some options may be available to help alleviate the situation by making some county jail sentences to be served at particular times or on particular days and by having defendants placed on probation with custodial aspects serve them on a staggered basis. See N.J.S.A. 2C:43-2b(7); State v. Hartye, 105 N.J. 411, 419 (1987); State v. Postal, 204 N.J. Super. 94 (Law Div. 1985). See also State v. Hughes, 230 N.J. Super. 223 (App.Div. 1989). It appears, however, that the trial judge continues, on an ongoing basis, to develop creative programs, such as the pretrial "wristlet program", in order to keep the jail population as low as possible consistent with the dictates of law and public safety.