JUSTICE LaVECCHIA delivered the opinion of the Court.
*477 **270 This appeal involves review of administrative action by the State Health Benefits Commission (SHBC) and the School Employees' Health Benefits Commission (SEHBC) (collectively, the Commissions). The Commissions administer the State Health Benefits Program (SHBP) and the School Employees' Health Benefits Program (SEHBP), respectively.
The subject matter of the appeal involves the method used by the Commissions to correct erroneously tiered reimbursement rates previously applied to members' out-of-pocket expenses for out-of-network behavioral health services. In a separate matter **271 involving a single plan member, the tiered reimbursement schedule was determined to have violated N.J.S.A. 52:14-17.46.7, which addresses the calculation of reimbursement rates for out-of-network health benefit services. Following that decision, the Commissions permitted members who paid for out-of-pocket behavioral health services and did not receive a proper reimbursement to obtain retroactive reimbursement for charges incurred between May 2009 and March 2014. The challenge here is to the reasonableness of the Commissions' notice to members who may have been affected by the application of the erroneous reimbursement rates.
For the reasons that follow, we reverse the Appellate Division's holding and remand the matter to the Commissions for further proceedings. Because we determine that significant questions exist concerning the extent of the notice actually provided, either by the Commissions or through their agents to active employees, former employees, and retirees, a hearing is necessary. The hearing is to be conducted in accordance with the principles outlined in this opinion and, at the hearing, the adequacy of the content of the notice can be raised.
I.
By way of background, we first address the prior decision of the Appellate Division that was the impetus for the Commissions' actions under review. The following facts, gleaned from that unpublished opinion, provide helpful background in this appeal, which comes to us without its own hearing record.
A.
On May 4, 2009, the Commissions established adjusted reimbursement rate percentages, calculated from a base rate for usual and customary charges, applicable to SHBP and SEHBP members for out-of-network behavioral health services. Under the new reimbursement scheme, which was made retroactive to January 1, 2009, the Commissions determined a usual and customary charge **272 reimbursement rate (the UCR) for outpatient behavioral health services from medical doctors and agreed to pay medical doctors one-hundred percent of that UCR. However, they determined to reimburse other behavioral health service providers at lesser percentages of that UCR. For example, the Commissions determined that a psychologist with a Ph.D. would be reimbursed at eighty-five percent of the UCR for medical doctors. A range of lower reimbursement-rate percentages *478 were assigned to the charges of other professionals.[1]
That new tiered rate scheme resulted from a recommendation made to the Commissions by Magellan Health Services (Magellan), the contractor used by the Commissions' third-party administrator, Horizon Blue Cross Blue Shield of New Jersey (Horizon), for health plans pertinent to this action. Horizon forwarded Magellan's recommendation to the Commissions, which approved the change for implementation. Significantly, for purposes of N.J.S.A. 52:14-17.46.7, neither Magellan nor Horizon are nationally recognized databases for purposes of determining UCR. The statute requires that plan participants be reimbursed at eighty percent of reasonable and customary charges, defined as "charges based upon the 90th percentile of the [UCR] fee schedule determined by the Health Insurance Association of America [now Prevailing Healthcare Charges System] or a similar nationally recognized database of prevailing health care charges." N.J.S.A. 52:14-17.46.7.
An SEHBP member, Philip Yucht, who received behavioral health services after the Commissions' adjusted reimbursement rates took effect, challenged the reimbursement he received for his out-of-pocket expenses. Under the new tiered reimbursement rates, Yucht's treatment by a licensed clinical social worker was **273 reimbursed at sixty-five percent of the UCR described above. The reimbursement rate formerly was one-hundred percent for that service. In a final agency determination, the SEHBC denied Yucht's challenge to the amount of his reimbursement after the new rates took effect.
Yucht appealed and the Appellate Division held that the tiered rates of reimbursement for non-medical-doctor behavioral health services were contrary to the legislative policies expressed in N.J.S.A. 52:14-17.46.7. In declaring the adjusted reimbursement rates arbitrary, capricious, and unreasonable, the panel stated that "[t]he statute's clear and unambiguous language revealed the Legislature's intent that a [plan] participant be reimbursed" at a statutorily prescribed rate determined by reference to a "nationally recognized database of prevailing health care charges." Here, because the Commissions relied on a non-nationally recognized database as the basis for the new rates, the adopted tiered scheme-applied in Yucht's case-imposed a rate of reimbursement for out-of-network professional behavioral health services not permitted under the statute.
B.
Importantly for the present appeal, after the afore-described Appellate Division decision, the Commissions each determined by resolution to reimburse plan members-those who did not receive proper reimbursement for incurred out-of-pocket expenses-at the appropriate rate, retroactive to May 2009.
The minutes of the meeting of the SEHBC held on March 7, 2014 state as follows:
[Philip] Yucht vs. SEHBC-This Appellate Court decision concerned the payment of out-of-network behavioral health claims. Commissioner Kelleher made a motion to apply the court decision back to the date of the change of the payment structure-May 2009-and reimburse *479 payment of behavioral health claims incurred since that date using the Reasonable and Customary allowance set forth in the **274 national database of charges; and if the Deputy Attorney General believes it is necessary, to require that the member provide proof of loss.
The motion passed by a vote of four to three.
The next week, the SHBC met on March 12, 2014, and the minutes of that meeting reveal unanimous approval of the following action:
Philip Yucht vs. SEHBC: [The Acting Secretary] advised the Commission that the draft resolution before the Commission would achieve the same result as the resolution that had been passed by the SEHBC. Commissioner Burdge made a motion to approve the resolution as drafted-Where a member provides proof of payment of coinsurance and amounts above the reasonable and customary charge, the Division of Pensions and Benefits and Horizon shall apply the Yucht decision retroactively and reimburse payment of behavioral health claims using the reasonable and customary allowance set forth in the national database of charges to claims incurred on or after January 1, 2009.
The Commissions attempted to notify members of the reimbursement opportunity in two ways. The Commissions placed a link (the link) on the website of the Division of Pensions and Benefits (the Division), which was labeled with a notice that stated simply, "Behavioral Health Services Claim Reconsideration-for SHBP and SEHBP members." The Commissions also sent a letter, dated July 22, 2014 (the letter), to certifying officers, human resources directors, and benefits administrators for public employers participating in the SHBP and SEHBP. The subject of the letter stated "Behavioral Health Claim Reimbursements Reconsidered."
In pertinent part, the letter advised the officers to whom it was directed that the Commissions "have directed [Horizon] to reconsider certain out-of-network claims for professional behavioral health services, reimbursed between May 4, 2009 and March 23, 2014." It stated, under the heading of "FILING A CLAIM RECONSIDERATION," that members
who received reimbursement for behavioral health claims for services provided by an out-of-network provider between May 4, 2009 and March 23, 2014, may be entitled to a reconsideration of their claims. Employees that want to pursue adjustments of these claims must provide proof that they paid the difference between Horizon BCBSNJ reimbursement and the provider's full charge.
**275 The letter instructed that plan members should complete a specific form to request adjustment and submit it with supporting documents to Horizon no later than December 31, 2014. It also stated that requests received after that date would not be considered. A copy of the form was enclosed with the letter and the officers were informed that the form also was available on the Division's website.
The second page of the letter, under the heading "EMPLOYER RESPONSIBILITIES," stated:
Please make this information available to your location's employees and forward this letter and attachment to your human resources staff, benefit administrators, and any other staff members responsible for the administration of health benefits for your location's employees.
It is undisputed in the record before us that the Commissions themselves did not send any form of individualized notice to potentially affected members.
*480 C.
In December 2014, the Communication Workers of America, AFL-CIO and the Clinical Social Work Guild 49 (the Unions) petitioned the Commissions to extend the deadline for the submission of requests for reimbursement. The Unions asserted that the notice provided was neither adequate nor meaningful and that the Commissions should either send individualized notice to all potentially affected members or, if a list of those members was not readily available, send notice to all SHBP and SEHBP members.
Subsequently, the SEHBC asked Horizon for information concerning the total amount of supplemental reimbursements made. After a review, the Commissions informed the Unions that they estimated that, including both SHBP and SEHBP members, there were approximately 1.4 million out-of-network behavioral health visits under the tiered reimbursement plan. That number was exclusive of services provided by a medical doctor, which did not qualify for further reimbursement. Combined, the Commissions received 857 claims for reimbursement reconsideration, of which 481 were denied for lack of proof. All told, the Commissions **276 reimbursed roughly $350,000. Claims received after the deadline were all denied.
By letter dated June 9, 2015, the Commissions informed the Unions that their petition was denied and the deadline for submission of requests for reimbursement was not extended.
The Unions appealed the Commissions' final action to the Appellate Division. See R. 2:2-3(a)(2). The Unions challenged the adequacy of both the form and substance of the notice provided by the Commissions concerning the opportunity for reimbursement. The Unions added, in their argument to the Appellate Division, that all members who were subjected to the inappropriate out-of-network reimbursement schedule should receive automatic supplemental reimbursement without having to provide proof of reimbursement at the wrongful amount.
During the appeal's pendency, the Unions' counsel submitted a request to the Division under the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. The OPRA request sought copies of all notices provided to retirees informing them of the ability to file a claim for additional reimbursement, as well as copies of all notices from certifying officers to employees notifying them of the ability to file a claim for additional reimbursement. The Commissions responded by providing the web address containing the aforementioned link on the Division's website as well as a web address containing the aforementioned letter to certifying officers.
In an unpublished opinion, the Appellate Division affirmed the Commissions' refusal to extend the deadline and provide further notice to affected members. In reaching its conclusion, the panel applied a highly deferential standard of review.
Concerning notice, the panel found that the Commissions had provided two forms: the link on the Division's website and the letter to certifying officers and like officials "directing them to make the reimbursement protocol available to employees." Although acknowledging that those communications were "perhaps **277 not the most effective form of notice," the appellate panel nevertheless could not "conclude that the notification procedure implemented ... was not reasonably calculated to advise eligible members of their right to seek supplemental reimbursement." Thus, the panel held that the Commissions' notice was adequate both in form and substance. Concerning the Unions' additional appellate argument that the Commissions *481 should simply provide automatic supplemental reimbursement, the panel refused to consider the issue because it was not raised before the Commissions.
We granted the Unions' petition for certification to consider whether the Commissions' method of implementing reimbursement for the involved out-of-network charges "provided adequate notice to potentially affected members." 231 N.J. 414, 176 A.3d 219 (2017). We also granted amicus curiae status to the New Jersey Education Association (the NJEA).
II.
A.
The Unions argue that the Commissions failed to give adequate notice of their determination to provide affected plan members with supplemental reimbursement for wrongly reimbursed out-of-network behavioral health professional services. They contend that the methods of providing notice were not reasonable for the purpose to be achieved; rather, they contend that the notice had to be reasonably calculated to reach potentially affected members. The Unions assert that, here, the Commissions used means of notice not reasonably likely-if not actually unlikely-to reach members, as evidenced by the fact that less than one-tenth of one percent of visits were accounted for in the number of claims filed as requests for reimbursement.
The Unions argue that the Division's website link provided notice of the potential for such supplemental reimbursement only if a number of things coalesced. A plan member would have to (1) find the link on the website, (2) decide from the cryptic description **278 that the link potentially applied to him or her, and (3) proceed through a series of "clicks" to arrive at the reimbursement form with its instructions, from which the plan member would have to (4) decipher what the "reimbursement reconsideration" means and requires. According to the Unions, that form of notice was simply unclear and ineffective.
Likewise, in respect of the letter, the Unions argue that the Commissions provided no evidence that certifying officers, or any like official, actually notified plan members in accordance with the letter. According to the Unions, the letter's terms end with a request, as opposed to any mandatory language, and therefore lack clarity concerning the imperative of reaching plan members. Further, there are categories of members who may have been affected by the wrongfully calculated reimbursement rates who are not addressed at all in the letter directed to participating employers. For example, the Unions emphasize that the Commissions have provided no evidence of notice to retirees who may have been affected by the inappropriately tiered reimbursement rates.
Finally, the Unions also contend that the hurdles for reimbursement are unreasonable. They point to the difficulty of expecting members to remember, with specificity, the exact dates of services received nine years ago. They assert that it is unreasonable to require members to provide information that the Commissions, or Horizon, may already have concerning out-of-network professional services and to require proof of members' payments when, they contend, that is not required for other reimbursements.
B.
Relying on their Appellate Division brief, the Commissions primarily argue that notice was adequate because, aside from providing a notification and link on the Division's website, the Commissions also sent a letter to participating employers' certifying officers directing that they *482 share information about the supplemental reimbursement with plan members at their location. The **279 Commissions argue that they were entitled to rely on N.J.S.A. 52:14-17.43 and N.J.A.C. 17:9-1.9 in assuming that their responsibility for notice was discharged by shifting that obligation, through the letter, to certifying officers.
Moreover, the Commissions assert that they have a duty to administer the SHBP and SEHBP efficiently and that individualized notice would be too burdensome.
Finally, the Commissions argue that the Unions' reliance on the number of claims for reimbursement as proof of the chosen forms' inadequacy for providing notice is misplaced. They contend that there is not a one-to-one ratio of claims for reimbursement to visits adjusted. Each claim for supplemental reimbursement involves payment for at least one, or more than one, visit. Thus, they contend that the number of actual visits whose rate of reimbursement may have been adjusted is likely higher than is reflected in the record.
C.
Amicus curiae the NJEA generally supports the arguments advanced by the Unions in this appeal. In addition, the NJEA advances arguments peripheral to those advanced by the Unions, including application of the "turn square corners," "fundamental fairness," and "fairness and rightness" doctrines; application of a de novo review standard based on an argument for no deference to the agency action in these circumstances; and application of a due process analysis.
III.
Our Court Rules codify the principle that final administrative agency action is subject to appellate review. See R. 2:2-3(a)(2). In such appeals, a deferential standard of review applies. Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980). Agency action will not be overturned unless the action is arbitrary, capricious, or unreasonable.
**280 Barrick v. State, 218 N.J. 247, 259, 94 A.3d 895 (2014) (applying standard in challenge by unsuccessful bidder to administrative award of contract for lease of office space); N.J. SPCA v. Dep't of Agric., 196 N.J. 366, 384-85, 955 A.2d 886 (2008) (applying standard in challenge to agency rulemaking); In re Herrmann, 192 N.J. 19, 27-28, 926 A.2d 350 (2007) (applying standard in quasi-judicial setting).
The arbitrary, capricious, and unreasonable standard is generally understood to involve inquiry into whether the decision conforms with relevant law, whether there is substantial credible evidence in the record as a whole to support the agency's decision, and whether in applying the relevant law to the facts, the agency clearly erred in reaching its conclusion. In re Carter, 191 N.J. 474, 482-83, 924 A.2d 525 (2007) (relying on Mazza v. Bd. of Trs., 143 N.J. 22, 25, 667 A.2d 1052 (1995) ). Ordinarily for quasi-judicial or rule-making final agency action, there is a substantial body of material comprising the record. In appeals from final agency action outside of such settings, there similarly must be a sufficiently developed record to permit a reviewing court to engage in meaningful review. See In re Issuance of Permit by DEP, 120 N.J. 164, 173, 576 A.2d 784 (1990) (relying on State v. Atley, 157 N.J. Super. 157, 163, 384 A.2d 851 (App. Div. 1978) ) (noting necessity of agency fact-finding to facilitate appellate review). When the challenged agency action arises in a setting where the record is too meager to permit meaningful review, supplementation of the record may be necessary. The Court Rules provide that a reviewing court may remand, on its own *483 motion, for supplementation of the record in order to permit meaningful review. R. 2:5-5(b).
In this instance, we consider whether the record presented here permits meaningful review and is therefore sufficient to give the agency's challenged final action the deference accorded to it by the Appellate Division. We conclude that it does not and therefore are compelled to order a remand to the Commissions in order for a hearing to be conducted.
**281 IV.
A.
No doubt, the Commissions acted with a sense of justice and rightness when, after the unpublished Appellate Division decision involving a single SEHBC member issued, they determined to provide potentially affected SHBP and SEHBP members with the opportunity to make claims for supplemental reimbursement at the proper amount.
That Appellate Division decision informed the Commissions that the dictates of N.J.S.A. 52:14-17.46.7 had not been followed in the adjustment to the rates of reimbursement for members' out-of-network behavioral health services. That rendered the adjusted rates, as applied to Yucht's case, inconsistent with the statute. Although the decision in Yucht's case did not speak in terms of retroactivity, the Commissions' resolutions established that the agencies would apply the decision retroactively to members seeking to obtain the reimbursement at the rate they should have received for out-of-pocket expenses. That administrative action by the Commissions avoided the potential for future applications by other affected individuals seeking to have the decision applied retroactively.
However, having determined to take the corrective action to bring their reimbursement rates for out-of-network charges incurred by plan members in line with the statute that the Commissions were charged to implement, the agency had to provide the benefit of that corrective action in a reasonable and non-arbitrary or capricious manner to those affected. See In re Carter, 191 N.J. at 482-83, 924 A.2d 525. Indeed, whenever an administrative agency acts, be that act mandatory or strictly voluntary, it must do so reasonably and in a manner calculated to achieve the policies expressed in the agency's organic statute. See 37 Steven L. Lefelt et al., N.J. Practice: Administrative Law & Practice § 7.17 (2d ed. 2000) ("When an agency has exercised its discretion unreasonably, a court will invalidate the action."). Therefore, because the Commissions **282 determined to reimburse affected members, they were necessarily required to do so reasonably and in a non-arbitrary manner. See ibid. Here, that means that the Commissions were required to provide reasonable notice in order that the retroactive benefit would fairly be made known and, thus, made available in a non-arbitrary manner to affected members. See In re Pub. Hearings on Amended Determination of Commuter Operating Agency for Fiscal Year 1975-1976, 142 N.J. Super. 136, 161, 361 A.2d 30 (App. Div. 1976) (ordering Commuter Operating Agency to reimburse railway commuters for overcharge resulting from procedurally defective fare raise and further ordering Agency to provide notice of right to request reimbursement and procedure for doing so).
As with most agency action, there is room for debate over what is reasonable. To be reasonable, an agency's choice of action for providing notice does not require adoption of a perfect practice. But, like the means an agency chooses for *484 purposes of meeting a public need contemplated by a statute the agency is charged with implementing, the means of notice in fulfillment of that statutory policy similarly must be designed to reasonably achieve its intended purpose. Cf. N.J. Chapter, Am. Inst. of Planners v. Bd. of Prof'l Planners, 48 N.J. 581, 600, 227 A.2d 313 (1967) (noting that regulatory actions must be "reasonably calculated to satisfy the [felt public] need"). Here, the intended purpose of the action challenged-the Commissions' attempted notice-was to reach persons who might have been affected by the wrongfully calculated reimbursement rate, to notify those persons of the availability of supplemental reimbursement, and to inform them of the procedures for requesting supplemental reimbursement.
From a pure reasonableness perspective, the Unions' preference for individualized notice by Horizon would undoubtedly constitute a best practice under these circumstances; but, that is not the standard by which the Commissions' action must be measured. In this circumstance, we review the agency's action for reasonableness but must also allow room for agency discretion in determining **283 how to proceed with the implementation of statutory policy now that the former tiered reimbursement scheme has been found lacking and the agency has undertaken corrective action to provide a remedy to a broader group of affected individuals.
The problem we find in this dispute over the adequacy of notice is that the evidence thus far produced has the capacity to support the claim that the methods of notice-the letter and website link-were not reasonably designed to likely reach the categories of members who may have been affected by the erroneous reimbursement rates. The Unions have advanced some evidence on which there could be based a finding that the notice was not reasonably designed to give notice to the proper universe of individuals affected. The Unions' presentation is premised on problems with the website's notice and the letter, as well as inferences from what is known about the small number of claims filed as compared to the universe of member claims that might have been affected by impermissibly reduced reimbursement rates. Against that presentation, based on the present record, we cannot conclude that either the website's ten-word, cryptically described notice and link or the letter to the certifying officers provides sufficient evidence to support deferring to the agency's choice of notice as reasonable.
Concerning the website, assuming that it is scanned by current and former plan members in a timely fashion to respond to its substance, the notice's wording is brief, technical, and lacking in detail about the essence of this reimbursement "reconsideration." The notice's wording and accompanying reference to a link does not appear, on its face, reasonably calculated to give a member notice that the out-of-pocket expense for out-of-network professional services for behavioral health counseling needs might have been underpaid, and that there is a process for providing evidence in order to obtain an adjusted reimbursement.
With regard to the letter sent to certifying officers, it too standing alone does not suffice to persuade, on this record, that the Commissions' attempted notice was reasonably calculated to **284 provide actual notice to potentially affected members, including former employees and retirees. There is too much that is unknown.
There is no evidence demonstrating whether or how certifying officers complied with the letter's request. The record is silent on whether certifying officers sent any notice to individuals, and if so, how it was accomplished. Indeed, the letter's closing *485 direction to the certifying officers is notably soft in its command, unlike the earlier wording in the letter describing the Commissions' action in ordering the retroactive reimbursement. The closing language of the letter is framed as a request, and then only asks that the newly opened avenue for reimbursement reconsideration be made available to members at the certifying officers' work locations. Further, the reference to the "work location" in no way suggests, let alone commands or directs, that former employees or retirees be notified of the availability of seeking reimbursement.
We reject the Commissions' reliance on N.J.S.A. 52:14-17.43, defining the duties of a certifying officer of a participating employer in the SHBP and SEHBP, as sufficient to assume that notice was given by those officers. Thus, without knowing more, we cannot conclude that the Commissions acted reasonably in choosing to direct notice in this fashion. We do not find that statute to confer such clarity of purpose in the setting we find here. N.J.S.A. 52:14-17.43 provides:
The certifying agent of each participating employer shall submit to the Division of Pensions such information and shall cause to be performed in respect to each of the employees of such employer such duties as would be performed by the State in connection with the program. The division shall have the power and authority to make such verification of the employment and other records of any participating employer as the division may deem necessary in connection with the program.
See also N.J.A.C. 17:9-1.9(b), (c) (describing duties of certifying officer, which include "providing documentation requested by the Commission or the Division in a timely manner" and "be[ing] responsible for all other duties relating to matters concerning the SHBP"). Simply put, that statute and its implementing regulation are insufficiently specific to be understood to command the certifying **285 officers to provide the notice that would be reasonably calculated to reach the broad group of individuals involved here.
As noted, the letter's command is subject to debate that is best left to a fact-finding hearing. With the thin record available, we do not know what action, if any, certifying officers generally took in response to the Commissions' letter. Nor, for that matter, does the record disclose what notice, if any, former employees and retirees received of the potential for supplemental reimbursement in light of the Commissions' apparent reliance on the link posted to the Division's website. While we do not foreclose the possibility that there may have been electronic follow-up with employees, past and present, or hard copy communication, as the Commissions suggest may have happened, the record is silent on the subject.
In sum, we cannot conclude that the website notice and link are sufficient to have provided notice to either present employees or former employees-either retired or those who simply moved on to other employment-that they might be entitled to enhanced reimbursement for previous member-incurred expenses for out-of-network mental health, or "behavioral health," professional services. And, we know little to nothing about the effectiveness of the letter sent by the Commissions in terms of it providing a basis for reasonable notice. Accordingly, we order a remand for the development of a proper record to permit meaningful judicial review. In that remand hearing, both the form and substance of the notice may be examined.
*486 B.
Ordinarily, the burden of proof is on a challenger to demonstrate that an agency's action is arbitrary, capricious, or unreasonable. See, e.g., Lavezzi v. State, 219 N.J. 163, 171, 97 A.3d 681 (2014) (noting that in challenge to administrative action burden is on challenger); Worthington v. Fauver, 88 N.J. 183, 208, 440 A.2d 1128 (1982) (same). The burden of proof is often said to be composed of two elements: (1) the burden of moving forward with some evidence sufficient to establish a prima facie case; and (2) the **286 burden of persuading the trier of fact. McCann v. George W. Newman Irrevocable Tr., 458 F.3d 281, 287 (3d Cir. 2006) ; 9 Wigmore on Evidence § 2487(a), (b), (c) (Chadbourn rev. 1981) (discussing placement of burdens of moving forward and persuasion and differences between them).
Traditionally, when a party bearing the ultimate burden of proof submits to a trier of fact a sufficient quantum of evidence to make out a prima facie case, that party is considered to have satisfied the burden of moving forward with evidence, which burden then shifts to the other party, requiring that party to produce some evidence in rebuttal. See, e.g., Ryan v. Mayor & Council of Demarest, 64 N.J. 593, 604-05, 319 A.2d 442 (1974) (holding, in challenge to Borough's refusal to consent to deannexation, that plaintiff's bringing forward of sufficient evidence to make out claim shifted burden of production to defendant); accord 2 McCormick on Evidence § 338 (Broun ed., 7th ed. 2013) (noting that where plaintiff presented prima facie case, "it is frequently said that ... the duty of going forward has shifted to the adversary, and this is unobjectionable if we bear in mind that the penalty for silence is very different here from that which was applied to the original proponent" (footnotes omitted) ). The burden shift results in an efficient presentation of relevant proofs and logical analysis of the parties' positions.
For similar efficiency motivations, we also have not shied away from shifting the burden of moving forward to the non-challenging party in circumstances where, because of some disparity in access to evidence and information, fairness and a need for a record encompassing all relevant information dictated that such shifting was necessary to reach a correct result. See J.E. ex rel. G.E. v. State, 131 N.J. 552, 570, 622 A.2d 227 (1993) (shifting burden to Division of Developmental Disabilities to prove that its transfer of developmentally disabled child was appropriate because agency kept extensive records and had unique expertise in area and access to information that challengers lacked). "We generally have **287 imposed the burdens of persuasion and production on the party best able to satisfy those burdens." Id. at 569, 622 A.2d 227.
Those two considerations impel us to direct that the parties bear the following burdens in the remand to take place following issuance of this decision.
Because the Unions have come forward with some evidence to support questioning the reasonableness of the notice, we regard the burden of moving forward with the evidence to have shifted to the Commissions to respond. That this matter comes before us as a challenge to final agency action and not in the context of, for example, a civil damages suit does not alter the applicability of traditional burden shifting. As discussed, the Unions bore the burden of bringing forward some evidence on which it can be reasonably found that the Commissions' attempted notice to affected SHBP and SEHBP members was inadequate. Although the record before us does not permit us to determine *487 whether notice was adequate as a matter of ultimate fact, it nevertheless permits us to find that the Unions have brought forth sufficient evidence of inadequacy to require the Commissions to respond with evidence to the contrary. Therefore, the Commissions shall be required on remand to respond with evidence of efforts made by certifying officers, or others with responsibility to provide notice, on behalf of participating employers to publish the required notice to members.
In imposing that evidential obligation in these unusual circumstances, we note that the Commissions are in a superior position to produce the necessary information for creation of a meaningful record on which to determine whether the notice given here was reasonably calculated to inform potentially affected members of the availability of supplemental reimbursement. We emphasize that the record need not plumb the efforts of each and every certifying officer to share the substance of the letter with members. For example, reliance on customary practices employed by the individuals in public positions at the time, and whether customary practice was being followed, has been used reliably in the **288 creation of administrative records in other settings. See SSI Med. Servs., Inc. v. Dep't of Human Servs., 146 N.J. 614, 622-23, 685 A.2d 1 (1996) (discussing use of custom and practice in administrative agency's mailing of reimbursement forms). No doubt, the Commissions have various means at their disposal to use in order to paint a picture of employer responsiveness through their letter to certifying officers since that is, in part, what the Commissions rely upon.
Finally, although the burden of moving forward has shifted to the Commissions for the remand proceeding, the ultimate burden of persuasion remains squarely and solely on the Unions' shoulders. See Worthington, 88 N.J. at 208, 440 A.2d 1128 (noting in challenge to Executive-branch acts that burden of persuasion rests on attacking party). Because the Unions brought this challenge, it is for the Unions on remand to bear the burden of persuasion and demonstrate that the notice, as implemented, was not adequate for its purpose and hence was an unreasonable exercise of the Commissions' discretionary authority.
V.
The judgment of the Appellate Division is reversed and the matter remanded for further proceedings consistent with this opinion.
CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, AND TIMPONE join in JUSTICE LaVECCHIA's opinion.

By way of further example, the rate for a clinical nurse specialist was set at seventy percent of the UCR, a thirty percent reduction. The rates for a licensed clinical social worker, a licensed marriage family therapist, and a licensed professional counselor were each set at sixty-five percent of UCR, a thirty-five percent reduction.