**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1414-22

CHRISTINE MCQUILKEN,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
TEACHERS' PENSION
AND ANNUITY FUND,

     Respondent-Respondent.

_____

Argued March 4, 2024 – Decided April 4, 2024

Before Judges Mawla and Vinci.

On appeal from the Board of Trustees of the Teachers' Pension and Annuity Fund, Department of the Treasury, Agency Docket No. TPAF No. 646009.

Jason Earl Sokolowski argued the cause for appellant (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, PC, attorneys; Jason Earl Sokolowski, of counsel and on the briefs).

Yi Zhu, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General,

attorney; Sara M. Gregory, Assistant Attorney General, of counsel; Yi Zhu, on the brief).

PER CURIAM

Petitioner Christine McQuilken appeals from the December 1, 2022 final agency decision of the Board of Trustees, Teachers' Pension and Annuity Fund (the "Board") denying her application for ordinary disability retirement benefits. Based on our review of the record and the applicable principles of law, we affirm.

McQuilken was employed by the Hunterdon Central Regional High School District (the "District") as a special education teacher from 2001 until she terminated her employment effective July 1, 2019. On December 3, 2018, she applied for ordinary disability retirement benefits alleging she was unable to perform her job duties due to chronic low back pain, central and lateral stenosis, progressive degenerative spine issues, and severe osteoarthritis of the spine and left hip.

On April 30, 2019, the Board arranged for McQuilken to be evaluated by an orthopedic surgeon. On July 11, 2019, the Board considered and denied her application for ordinary disability benefits because it determined she was not totally and permanently disabled from performing her regular and assigned duties. McQuilken requested an administrative hearing to appeal the Board's

decision and the matter was transferred to the Office of Administrative Law. An Administrative Law Judge ("ALJ") conducted a two-day hearing at which McQuilken, her orthopedics expert, and the Board's orthopedics expert testified.

McQuilken testified that a typical day for her during her last year of work consisted of four classes and a tutorial from 7:20 a.m. to 3:00 p.m. The essential performance responsibilities enumerated in the job description for a special education teacher included developing lesson plans and classroom learning activities, identifying pupil needs, providing appropriate instruction, communicating with parents, and cooperating with other staff in assessing and resolving learning problems.

Her job description also contained an "ADA [Americans with Disabilities Act] compliance" section that described certain physical demands "that must be met . . . to successfully perform the essential responsibilities and functions of the job . . . [u]nless reasonable accommodations can be made . . . ." The demands included lifting items needed to perform the functions of the job, remaining stationary for required periods of time, moving from place to place, participating in emergency drills, and frequent reaching, bending, twisting, climbing, squatting, balancing, stooping, pushing, and pulling. The job description stated "[r]easonable accommodation may be made to enable

individuals with disabilities to perform the essential responsibilities and functions of the job."

According to McQuilken, for several years before she stopped working, she "was having knee issues" and, after she underwent right hip replacement surgery in 2011, she "had back issues," and then her left hip "started to go" which resulted in pain in her knees, lower back, and left hip. She testified her back pain would "[w]ax and wane" depending on how active she was. She experienced pain in both knees, but not at the same time. She described the knee pain as a burning sensation that would come and go. During her last year of work, she experienced constant pain in her left hip. She received injections in her back, knees, and left hip that provided some relief.

McQuilken submitted her application for ordinary disability retirement benefits in December 2018 because she believed she was not "doing [her] job the way . . . [she did her] job." Specifically, she was late to class and meetings and could no longer perform hall duty because of the pain in her knees, left hip and back. She experienced pain in those areas since 2012, but in 2018 she began to experience pain in two or three locations at once and could no longer manage the pain with medication and physical therapy.

The pain made it increasingly difficult for McQuilken to perform certain

4

physical aspects of her job, such as walking up and down stairs, moving around the classroom, realigning and lifting desks, moving between the upper and lower campuses of the school, and standing for long periods of time. McQuilken explained that because of the individual attention necessary for her special education students, she needed to move around the classroom to each student during class. She also needed to carry her laptop from class to class which caused "a heaviness" in her lower back. Her job required repetitive bending, and squatting to put materials up on walls, pull down maps, pick things up from the ground, and assist students at their desks.

McQuilken requested that the District schedule her classes in one building and furnish her with an elevator key, which it did. She also requested to be excused from additional duties associated with standardized testing, which the District accommodated. Despite those accommodations, McQuilken testified she still needed to use the stairs daily because the elevator was at the end of the hallway, and it was difficult for her to navigate through students in the hallway. In addition, she needed to go to the library and attend assemblies in another building. She was also required to take part in fire drills and other safety drills that required her to clear the hallways, lock the classroom door, cover the windows, and sometimes escort students from one campus to the other. She did

not request any additional accommodations because she did not want to "feel like [she was] causing a problem . . . ."

McQuilken continued to work from December 2018 until July 1, 2019, because she was not emotionally or financially ready "to go out." During that period, she tried to "push through" work, but would sometimes need to take half-days, sick days, or other leave. She did not provide any evidence of the number of days she missed or was late. McQuilken had a walking cane but only used it on "really bad days" at work because she was trying to be discreet about her medical condition and was embarrassed.

McQuilken testified that her treating orthopedist, Dr. Aleya Salam, advised her to stop working before December 2018. In a medical note dated November 8, 2018, however, Dr. Salam indicated McQuilken was "[w]orking on full duty," had "[n]o active problems," was "not disabled permanently," and was "functioning well with activities of daily living." On November 19, 2018, Dr. Salam prepared a medical certification in which she opined McQuilken was totally and permanently disabled and no longer able to perform her assigned job duties, noting there can be "no limited duty in teaching." On September 25, 2018, McQuilken's primary care physician, Dr. Pamela Donetz, also prepared a medical certification in which she opined McQuilken was totally and

permanently disabled and unable to perform her assigned job duties, noting her "job duties require extensive walking often on a time schedule which she is unable to do."

McQuilken's orthopedics expert conducted an independent medical examination on June 10, 2020, nearly eighteen months after McQuilken filed for disability retirement benefits and one year after she stopped working. He diagnosed McQuilken with cumulative and repetitive trauma and occupational low back syndrome, a herniated disc at L5-S1, bulging discs in the lumbar spine, lumbar facet joint arthropathy, lumbar spine degenerative disc disease, chronic patellofemoral syndrome and degenerative joint disease in both knees, and osteoarthritis and bursitis in her left hip.

Based on his review of McQuilken's medical history, subjective complaints, treating physicians' reports, job description, and his own physical examination, the expert concluded she was totally and permanently disabled from performing her essential job duties. He opined that McQuilken's progressive spinal issues would result in her inability to do the standing, bending, and reaching over that is required of her job. The expert also opined that she would probably need a total left knee replacement and would be unable to do the kneeling, squatting, climbing, and stooping required. He did not

address her ability to perform the essential performance responsibilities of her job, such as developing lesson plans and instructing students.

McQuilken's expert conceded his opinion was limited to whether McQuilken could do her job as of the date of his examination, June 10, 2020. He testified: "I could [m]ake a[n] assumption and say based upon the exam and the medical records . . . that in [2018] when she applied for her pension, she was disabled. . . . [B]ut we never do a retro[active] opin[ion]." He continued, "I do[]n[o]t know if that[ i]s my call. I really think . . . that[ i]s the [ALJ's] call to make . . . ."

The ALJ questioned McQuilken's expert to clarify his testimony, as follows:

> [ALJ]: Okay. All right, [d]octor. I just have one question. When you had testified about that you don't do a retroactive determination about disability.
>
> [McQuilken's Expert]: Yes.
>
> [ALJ]: So I just . . . want to be clear when you said — . . . .
>
> [McQuilken's Expert]: On ordinaries, there[ i]s a little retro[active] here so I mean, I do know she was on the Class II Opioid . . . . She[ i]s taking it every six hours for her pain. We know that she[ ha]s had multiple MRI films. We know that there[ i]s a progression on the degenerative joint disease in both knees as well as in this hip[,] so we know that there[ i]s progression. <u>But</u>

> I would feel more comfortable if you make the call as to when you feel this came to a head.
>
> [ALJ]:  All right.  Well, so I understand what you[ a]re saying about your comfort level but I[ a]m just trying to get an understanding of your opinion so you are testifying to a reasonable degree of medical certainty that in June of 2020 that she[ i]s disabled and you[ a]re saying that that is your theory as to 2018 . . . .
>
> [McQuilken's Expert]:  Right.  It would be my theory that [be]cause I did[]n[o]t examine her in 2018 and . . . I do[]n[o]t like to give that opinion . . . and so if you put me up against the wall and say, "well, in [2018] do you think she could work?"  Well, we already know she had the herniated disc, she had the spinal stenosis, she had the hip problem, she had the knee tri-compartmentalized arthritis.  She[ i]s on the Class II Opioids.  It would be easy for me to say "yeah, you know what [a] [special] ed[ucation] teacher could[]n[o]t do the job anymore."
>
> [(Emphasis added).]

The Board's orthopedics expert conducted an independent medical examination of McQuilken on April 30, 2019, four months after she filed her application for benefits and two months before she stopped working.  Based on his review of McQuilken's medical records and his own examination, the Board's expert diagnosed McQuilken with pain in both knees, arthritis in her hip, and low back pain.  His examination of her back revealed tenderness, but no evidence of muscle spasm or nerve compression.  He noted that a 2012 MRI

showed lumbar spondylosis and hypotrophy, a degenerative change which could cause lower back pain, and the records indicated McQuilken underwent epidural and facet injections in her lumbar spine for pain relief.

His examination also revealed arthritis with limited range of motion of her left hip, which could cause pain. The Board's expert concluded McQuilken had good range of motion of her knees, and the records indicated she had steroid and other injections to relieve pain and slow the progression of the arthritis in her knees. Based on his review of MRI reports from 2012, 2015, and 2019, he opined McQuilken had degenerative changes in her lumbar spine, but the reports appeared to be similar and indicated she had the same degenerative conditions in her lumbar spine for several years. The MRI reports did not reveal a disc herniation and his physical examination did not indicate McQuilken had either a motor sensory or reflex deficit consistent with a disc herniation.

The Board's expert concluded McQuilken was not totally and permanently disabled largely because she was still working when he examined her. On February 1, 2021, after reviewing additional medical records, the Board's expert authored an addendum report in which he stated, "the conclusions in my prior report remain unchanged. At the time I examined her, she was working. There is nothing in the records stating that she was permanently disabled from her job.

If there is a concern about this, then the individual should be re-evaluated."

The Board's expert noted incorrectly in his report that McQuilken previously underwent right knee replacement surgery and had a related scar. At the hearing, he testified that notation was an error because McQuilken had a right hip replacement, not a knee replacement.

Following the hearing, the ALJ issued a twenty-three-page initial decision affirming the Board's denial of McQuilken's application. The ALJ concluded McQuilken failed to demonstrate by a preponderance of the credible evidence she was unable to perform her regular and assigned duties at the time of her application or at the time she terminated her employment.

The ALJ did not "accept [the] testimony and opinion" of McQuilken's expert as "fully reasonable or reliable." She reasoned because he was only able to offer "assumptions" as to whether McQuilken was disabled when she applied for benefits, his opinion did not "rise to the requisite reasonable degree of medical certainty." In addition, the expert did not address her ability to perform the essential responsibilities of her job.

The ALJ did not accept the testimony and opinion of the Board's expert because he "made several mistakes in his report" including noting incorrectly that McQuilken had knee replacement surgery and a related scar. The ALJ also

11

rejected his testimony because "the main reason he found [McQuilken] not to be disabled was the fact that she was working at the time of his evaluation" and concluded she was "precluded from being deemed disabled." As a result, the ALJ was "unable to give greater weight to the testimony of either expert."

The ALJ found McQuilken's testimony credible and determined she "had difficulty in meeting the physical demands of her job and . . . had pain in her back, knees, and hip." The ALJ noted there was no evidence to establish "the number of days or frequency . . . [McQuilken] took off from work or otherwise used leave time due to her medical condition."

The ALJ found, "neither [McQuilken], nor her treating physicians, nor her expert, addressed her ability to perform the essential responsibilities of her job . . . ." She found "[w]hile [McQuilken] believed she was not performing her job duties as she wanted or as she believed she should, there [was] no competen[t] evidence in the record that she was unable to perform the essential responsibilities of a special education teacher." The ALJ determined McQuilken:

> failed to demonstrate an inability to perform the essential teaching and/or teaching related responsibilities of her job as a special education teacher. Although the job of special education teacher certainly has physical demands, it involves much more than its physical demands. Moreover, while

12

[McQuilken] requested the use of the elevator and that her classes be scheduled in one building, there is no evidence in the record of her seeking any additional accommodations to the physical demands of the job that would have enabled her to continue performing the essential performance responsibilities. Indeed, [McQuilken] acknowledged that she tried to be discre[et] at work regarding her condition and that she rarely used a cane.

The ALJ concluded McQuilken failed to demonstrate she: (1) was physically incapacitated for the performance of the duties of a special education teacher; (2) was unable to perform her regular and assigned duties due to a permanently-disabling medical condition at the time of her application for benefits; and (3) was physically incapacitated for the performance of duty at the time she terminated her employment.

After considering McQuilken's exceptions to the ALJ's initial decision, the Board adopted the ALJ's decision. On appeal, McQuilken argues the Board's decision was arbitrary, capricious, and unreasonable because the ALJ erroneously concluded she did not demonstrate by a preponderance of the credible evidence that she is totally and permanently disabled. McQuilken also contends the ALJ erred by not accepting her expert's testimony and affording it greater weight than the testimony and opinion of the Board's expert. Finally, she argues the Board violated its own regulations in processing her application.

13

"Our review of a pension board's decision in the fact sensitive matter of disability retirement benefits is limited." Rooth v. Bd. of Trs., Pub. Emps.' Ret. Sys., 472 N.J. Super. 357, 364 (App. Div. 2022) (citing Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018)). An agency's action on the merits will be sustained unless that action is arbitrary, capricious, or unreasonable. In re State & Sch. Emps.' Health Benefits Comm'ns' Implementation of Yucht, 233 N.J. 267, 279 (2018).

Our role in reviewing decisions of an administrative agency is generally limited to: (1) whether the agency's action violates legislative policies; (2) whether the record contains substantial evidence to support the agency's findings; and (3) whether "the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors." Allstars Auto Grp., 234 N.J. at 157 (quoting In re Stallworth, 208 N.J. 182, 194 (2011)). If the "evidence and the inferences to be drawn therefrom support the agency . . . decision" we must affirm even if we might have decided differently. Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001) (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988)).

"It is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is

ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (alteration in original) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997)). However, we are not bound by an agency's interpretation of a statute, or its determination of a strictly legal issue. Allstars Auto Grp., 234 N.J. at 158.

Pursuant to N.J.S.A. 18A:66-39(b), a teacher "shall . . . be retired for ordinary disability" if a physician designated by the Board examines the teacher and certifies the teacher is "physically or mentally incapacitated for the performance of duty and should be retired."[1] The burden lies with the applicant to prove such incapacitation by a preponderance of the credible evidence. Bueno v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 404 N.J. Super. 119, 126 (App. Div. 2008). An applicant must "at a minimum prove an 'incapacity to perform duties in the general area of [their] ordinary employment . . . .'" Id. at 131 (quoting Skulski v. Nolan, 68 N.J. 179, 205-06 (1975)). An applicant cannot "merely show[] inability to perform the specific job for which [the applicant] was hired." Skulski, 68 N.J. at 205-06.

---

[1] An ordinary disability is a "[p]ermanent and total disability resulting from a cardiovascular, pulmonary or musculo-skeletal condition which was not a direct result of a traumatic event occurring in the performance of duty." N.J.S.A. 43:15A-43(a).

Applying <u>Skulski</u> and <u>Bueno</u> in light of our limited scope of review, we are satisfied the Board's decision was not arbitrary, capricious, or unreasonable. The ALJ found that although McQuilken had difficulty with the physical demands of her job and subjectively believed she was not doing the job the way she would have preferred, there was no competent evidence in the record to show she was unable to perform her essential responsibilities. The ALJ noted there was no evidence in the record to establish the number of days McQuilken missed or was late to work, nor was there any objective evidence to support her claim of total and permanent disability. In addition, the ALJ found McQuilken did not seek "additional accommodations to the physical demands of her job that would have enabled her to continue" performing her essential responsibilities. The Board's decision is supported by sufficient credible evidence in the record and was not arbitrary, capricious, or unreasonable.

McQuilken's contention that the ALJ improperly failed to give greater weight to her expert's testimony is not persuasive. The ALJ, as the finder of fact, had to assess the credibility of the experts to determine the weight accorded to each witness's testimony. <u>Angel v. Rand Express Lines, Inc.</u>, 66 N.J. Super. 77, 85-86 (App. Div. 1961). We are not required to defer to the ALJ on the credibility of expert witnesses. <u>ZRB, LLC v. N.J. Dep't of Env't Prot.</u>, 403 N.J.

Super. 531, 561 (App Div. 2008). However, the ALJ's findings regarding the reasonableness and reliability of their testimony are entitled to deference because the ALJ heard the testimony and was in the best position to assess their credibility. See S.D. v. Div. of Med. Assistance & Health Servs., 349 N.J. Super. 480, 484 (App. Div. 2002).

Here, McQuilken's expert did not examine her until June 10, 2020, nearly one year after she retired, and declined to offer an opinion based on a reasonable degree of medical certainty that she was disabled before that date. Rather, he limited his testimony to "assumptions" he "could [m]ake" and refused to offer a retroactive opinion. The ALJ's finding that the expert's testimony was not "fully reasonable or reliable" on the question of whether McQuilken was disabled prior to June 2020 was amply supported by the testimony. We discern no basis to disregard the ALJ's determination as to the weight accorded to the expert's testimony.

McQuilken's contention that the Board violated its own regulations lacks merit. Specifically, she argues the Board processed her application before she terminated her employment in violation of N.J.A.C. 17:1-6.4(a) and (c), and was required to have its expert reexamine her to determine whether she was disabled at the time she stopped working. N.J.A.C. 17:1-6.4(a) states: "Each disability

retirement applicant must prove that his or her retirement is due to a total and permanent disability that renders the applicant physically or mentally incapacitated from performing normal or assigned job duties at the time the member left employment . . . ."[2] N.J.A.C. 17:1-6.4(c) provides: "The [Division of Pension and Benefits] will review all disability retirement applications submitted after a member has terminated service to determine whether the member's application is eligible for processing . . . ."

In this case, the ALJ determined McQuilken failed to prove she was disabled at the time she applied for disability benefits or when she terminated service on July 1, 2019. The Board considered and denied McQuilken's application on July 11, 2019, and issued its final decision adopting the ALJ's decision on July 15, 2019, after McQuilken terminated service. The Board did not violate N.J.A.C. 17:1-6.4(a) or (c).

Finally, McQuilken's contention that the Board should have required its expert to reexamine her is not convincing. The ALJ did not accept the testimony and opinion of the Board's expert as reasonable or reliable and did not consider it in her determination that McQuilken was not physically incapacitated for the

---

[2] The ALJ incorrectly cited N.J.A.C. 17:3-6.7(a), which concerns accidental rather than ordinary disability retirement benefits. Substantively, there is no difference.

performance of duty. There is no basis to conclude a reexamination by the Board's expert after McQuilken stopped working would have led to a different result. Further, it was McQuilken's burden to prove she was totally and permanently disabled at the time she stopped working, which she failed to do.

The Board's decision is supported by sufficient credible evidence in the record. R. 2:11-3(e)(1)(D). To the extent we have not addressed McQuilken's other arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19

A-1414-22